Girard Estate

Before: KLEIN, P. J., BOLGER, HUNTER, LEFEVER, SAYLOR and SHOYER, JJ.

### Re: Application of William Ashe Foust

BOLGER, J., Hearing Judge, July 29, 1955.—William Ashe Foust, age 8, hereinafter called the applicant, a Negro orphan boy residing in Philadelphia, by his mother, has filed a petition in this court seeking a review of the resolution of the Board of Directors of City Trusts, trustee of the will of Stephen Girard, hereinafter called the Board, in dismissing his application for admission to Girard College, hereinafter called the College, solely because he is not "white". Hon. Joseph S. Clark, Jr., Mayor of Philadelphia, and Hon. George Schermer, Director of the Commission on Human Relations of the City, have filed a joint petition, pursuant to a resolution of City Council, joining in the prayer of the applicant. The Board has filed answers wherein it asserts the applicant was denied admission because he is not a "poor white male orphan". The petitions pray for a decree reversing the action of the Board and ordering it to admit the applicant to the College.

Robert Felder, age 7, another Negro orphan boy, contemporaneously filed, by his mother, a similar petition to which an answer containing identical denials has been filed. The decision here will control the Felder case.

The appearances of the Mayor and of the Director of the Commission on Human Relations are in their official capacities. The Mayor also appears as an ex officio member of the Board.

Originally, a single petition was filed on behalf of the present applicant and of other colored boys. An answer was filed by the Board. This petition and an-

swer together with the Mayor's petition and the answer thereto were referred by the court to the hearing judge. The latter immediately called a pre-trial conference at which he pointed out several possible defects in the pleadings which might require the hearing judge, or a reviewing court, to decide the case on some point other than the issues as now presented: John P. Peters v. Oveta Culp Hobby et al., 349 U. S. 331. The original petition of the applicants was withdrawn without prejudice and the present petitions and answers were filed. Later the applicant was examined mentally and physically by the Board, the same as are white applicants, with the result that the applicant fully qualified except that he is not "white".

The Board, in excluding the applicant, rules that it legally had no alternative because of its obligation to adhere to the terms of the will. In making this decision it acted as a unit: Hunter's Orphans' Court Commonplace Book, Vol. II, "Trustees", 6(a).

The purpose of the petitions is clearly explained in the brief filed on behalf of the City of Philadelphia: "Far from urging any change based upon fashion or custom, or any 'deletion' from the Will of Stephen Girard, the City's position in this proceeding is that the acts of its officers should be brought into conformity with the requirements of constitutional law and public policy which have evolved during the 125 years since the Will was written in 1830. It is to carry out the dominant purposes and the educational objectives expressed in the Girard Will, interpreted in the light of the major changes during the past century and a quarter in law, public policy, education, the social sciences and human relations, that the City urges the removal of the color restriction upon admission to Girard College."

The Attorney General of Pennsylvania, upon the invitation of the court, entered the case as parens

patriae to fulfill his duty of enforcing the trust: Abel et al. v. Girard Trust Co. et al., 365 Pa. 34, and representing the Commonwealth's possible interest in remainder, and filed an answer to the petition, which was subsequently withdrawn. On July 7, 1955, the Attorney General filed a separate petition joining in the prayers of the other petitioners. To this petition the Board filed an answer identical with its other answers. The court on April 7, 1955, appointed James M. Marsh, Esq., amicus curiae.

Three days of hearings were held at which oral and other evidence was presented. An accurate description of the petitioners' testimony appears in the City's brief as follows:

"The witnesses for the City furnished expert testimony concerning the conditions of 1830 and the developments since that time. Dr. Sculley Bradley, Chairman of the Graduate Department of American Civilization and Professor of English at the University of Pennsylvania, compared the culture of Girard's lifetime, particularly the condition of the Negro and the educational system, with conditions today. (N.T. 75-157) Developments in the social sciences and in educational policy and practice are set out in the testimony of Dr. Isidor Chein, Professor of Psychology at New York University (N.T. 520-576); Dr. Ira DeA. Reid, Professor of Sociology at Haverford College (N.T. 173-205); Dr. Alice V. Keliher, Professor of Education at New York University (N. T. 205-233); and Dr. Gilbert White, President of Haverford College (N.T. 157-173). These four witnesses have testified to the advantages to be gained by white students from eliminating the color bar on admission to Girard College; and Mr. George Schermer, Executive Director of the Commission on Human Relations and Mr. Maurice B. Fagan, Executive Director of the Phila-

delphia Fellowship Commission, have testified to the benefits to the community. (N.T. 242-313, 315-341)."

The President of Girard College, Dr. Merle E. Odgers, since resigned and now President of Bucknell University, and the Vice President, Dr. E. Newbold Cooper, now President of the College, and John E. Diemand, an alumnus of the College, President of the Board and also President of the Insurance Company of North America, testified in rebuttal that no change is required. The general curriculum and the religious and social training of the students was detailed and the uniformly high record of accomplishment of the graduates of the College was related.

On June 3, 1955, argument was held and briefs presented. The briefs and the argument of the parties do not agree upon the identification or classification of the broad issues present. After much deliberation, the hearing judge places them in three categories; legal, constitutional and equitable. However, the evidence and the legal principles involved at times embrace all three categories.

Stephen Girard died December 26, 1831. His will dated February 16, 1830, and codicils dated respectively December 25, 1830, and June 20, 1831, were duly probated. He provided, following gifts to relatives and friends and for charitable purposes, substantial trusts for the improvement of the City and then left the major portion of his estate in trust to "the Mayor, Aldermen and citizens of Philadelphia" (the then title of the City) for the establishment of a college for the education and maintenance of "poor male white orphans". The order for acceptance of applicants was fixed according to the place of their birth: (1) the City of Philadelphia; (2) the rest of Pennsylvania; (3) the City of New York (4) the City of New Orleans. His lengthy will is a model of detailed expres-

sion of carefully conceived purposes, plans and methods. The provisions of immediate importance are as follows: In paragraph XXI-3, after providing for the establishment of the college, he states: "as many poor white male orphans, between the ages of six and ten years, as the said income shall be adequate to maintain, shall be introduced into the college as soon as possible; and from time to time as there may be vacancies, or as increased ability from income may warrant, others shall be introduced." In Paragraph XX appears the following: "And whereas I have been for a long time impressed with the importance of educating the poor, and of placing them by the early cultivation of their minds and the development of their moral principles, above the many temptations, to which, through poverty and ignorance they are exposed; and I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of the public funds: . . . Now, I do give devise and bequeath all the residue and remainder of my real and personal estate . . . unto The Mayor, Aldermen and citizens of Philadelphia their successors and assigns in trust. . . ." In Paragraph XXIV-3 he states that the provision for the College is his primary object. In Paragraph XXI-7, after providing for the feeding, clothing and lodging of the students, he states:

"They shall be instructed in the various branches of a sound education, comprehending reading, writing, grammar, arithmetic, geography, navigation, surveying, practical mathematics, astronomy, natural, chemical, and experimental philosophy, the French and Spanish languages (I do not forbid, but I do not recommend, the Greek and Latin languages)—and such

other learning and science, as the capacities of the several scholars may merit or warrant: I would have them taught facts and things, rather than words or signs: And, especially, I desire, that by every proper means a pure attachment to our republican institutions, and to the sacred rights of conscience, as guaranteed by our happy constitutions, shall be formed and fostered in the minds of the scholars." He also provides for the dismissal of students for mal-conduct. In sub-paragraph 9 he states: "Those scholars, who shall merit it, shall remain in the college until they shall respectively arrive at between fourteen and eighteen years of age; they shall then be bound out by the Mayor, Aldermen and citizens of Philadelphia, or under their direction, to suitable occupations, as those of agriculture, navigation, arts, mechanical trades, and manufactures, according to the capacities and acquirements of the scholars respectively; consulting, as far as prudence shall justify it, the inclinations of the several scholars, as to the occupation, art, or trade, to be learned."

The College opened in 1858 and has been functioning ever since. Today the estate is estimated to be worth more than $98,000,000. The income in 1954 was $2,144,312. The present student body fluctuates in number around 1137; the average per capita cost of education and maintenance is $1,853.34. Due to losses in the holding of coal lands, all of these figures will be reduced hereafter. The real estate comprising the College, although exempt from taxation, is assessed at $10,029,600.

Immediately after Girard's death the Legislature of the Commonwealth, consistently with the then existing State Constitution, passed two statutes implementing the will and authorizing the city to do everything necessary to accept the property and to serve as trustee in order to fulfill Girard's purposes. The

city passed ordinances providing for a Board of Trustees. On January 31, 1833, an ordinance provided that the trustees were to be the Mayor, the Presidents of Select and Common Councils and fifteen other citizens to be chosen by the Councils to serve for a term of three years.

Pursuant to the Acts of Assembly and ordinances of Councils, the applicants upon admission to the College are indentured to the Board which also becomes guardian for their estates until they reach the age of twenty-one.

Immediately following the probate of the will and codicils, Girard's heirs attacked their validity. This contest was disposed of by the Supreme Court of the United States in Vidal et al. v. Girard's Executors, 2 Howard (U. S.) 127 (1844), the decision in which case probably established the basic principles of the law of charitable trusts in this country. It decided that the City could legally serve as trustee; that the trust was not a superstitious one and that the projected College was not an atheistical institution in spite of the provision in the will excluding clergymen from ever entering the grounds. A second suit by the heirs was decided against them by the Supreme Court of the United States in Girard v. Philadelphia, 74 U. S. 1 (7 Wallace 1) 1868. When the College was about to open, further enabling legislation, including State Statutes and City Ordinances were passed. In 1854 the other townships of the County of Philadelphia were consolidated with the then City under the title of "City of Philadelphia."

On June 30, 1869, P. L. 1276, the Legislature created the present Board of Directors of City Trusts and transferred to it the administration of this and many other similar trusts. The Board consists of fifteen members including the Mayor and the President of City Council, both ex officio, and twelve other

citizens appointed by the Judges of the Courts of Common Pleas of the County. The Board is authorized to make suitable regulations and is required to report annually to the City Council, to the State Legislature and to the Judges of the Courts of Common Pleas and to publish the reports in Philadelphia newspapers. The funds of the trust are to be handled by the City Treasurer who must segregate the accounts and the City Controller is authorized to audit those accounts. The Act states that the members of the Board are City officers, but that no compensation or emolument shall be paid them. The passage of this Act provoked a third attack upon the will. It was alleged in the third attack that the Act of 1869 was unconstitutional. In Philadelphia v. Fox et al., 64 Pa. 169 (1870), the Act of 1869 was declared constitutional. In the opinion, the Supreme Court (p. 182) stated:

"The trusts held by the City of Philadelphia, which are enumerated in the bill before us, are germane to its objects. They are charities and all charities are in some sense public."

It then carefully delineates the powers of the Board and its responsibility. In 1936 the then Mayor sought an accounting of the trust in the Courts of Common Pleas of this County, in order to ascertain if there were surplus funds to which the City would be entitled as a secondary income beneficiary under the will. This litigation was decided in Wilson v. Board of Directors of City Trusts et al., 324 Pa. 545 (1936), wherein the Court approved the Fox decision and transferred the suit to this court for decision, stating that the Mayor as an ex officio member of the Board had the right to an accounting. In 1949 the Legislature authorized the City of Philadelphia to adopt its own Charter. In 1951 the citizens of Philadelphia at a special election, in accordance with this Act, adopted

the present Home Rule Charter. Much other legislation and several other court decisions, appellate and nisi prius not important here, characterized the history of this trust.

The validity of Girard's will and the capacity of the City to serve as trustee are not questioned. It is now contended, however, that in the light of present conditions, changes of public policy, the amendments to the Federal Constitution, intervening Acts of Assembly and decisional law, the will must be construed elliptically, so that the word "white" shall be eliminated.

The petitioners argue that the expressed dominant particular purpose of the will was the welfare of the City of Philadelphia; that Girard's direction that the trust be administered by the City supervened his purpose of providing education and maintenance for the designated beneficiaries; that he did not intend to create a private school, but rather a public school and orphanage, administered by the City in its governmental capacity; that his direction that the students must receive sound moral and ethical instruction in the republican institutions of our country, by teaching them facts and things rather than words and signs, cannot be carried out without racial integration; that the word "white" occurs only twice in the entire will, whereas the word "orphans" is frequently used, showing that Girard had as his concern orphans generally without regard to race; that there is no express prohibition against admitting orphans who are non-whites; and finally, that the use of the word "white" must be construed as a condition attached to the gift, and since such a condition is now against public policy, the word must now be stricken from the will as an invalid provision.

Rules and canons of construction are to be used only where necessary to ascertain the intent of a tes-

tator, and can be resorted to when the intent is uncertain or the language is ambiguous: McFadden Est., 381 Pa. 464 (1955). Among the outstanding characteristics of this will is the meticulous use of plain, unequivocal and unambiguous language. A reading of the will, from its beginning to end, leaves no doubt that Girard knew exactly what he intended, and expressed his many intentions with clarity and simplicity.

It would be error to deny that he intended to benefit the City of Philadelphia and its citizens. His will is replete with other gifts directly to the city and in trust for strictly municipal purposes. The establishment of the College, to the extent that it relieves the City of the care and education of the class he selected, is one of the proofs that he established a public charity. There is nothing in the will from which it could be implied that Girard's fundamental purpose was to establish this as a governmental trust, or that to have the City administer his trust was more important than the advantages he intended to confer on the beneficiaries he designated. His selection of the City as trustee was but a means to an end; his purpose was to make certain that a perpetual body would carry out the trust without interruption, in the same faithful manner as other Trusts committed to its charge. To insure this result, he prudently required that the funds be kept separate and apart from other trusts held by the City, both under his will and from other testators, and required that reports of the condition of the trust and of the operation of the College be published annually and copies sent to the State Legislature. He wanted the pitiless light of publicity to guarantee against corrupt or inefficient management and political or other favoritism.

There can be no validity in the assertion, that because the trust is administered by a public agency

that Girard intended the College to be a public institution. The many provisions in the will respecting the conduct of the school show an exactly opposite intention. The following instructions spell out a clearly expressed purpose to create a private school in accordance with the testator's direction and not that of some governmental body: The indenturing of boys; the management of their property, the method of selecting students; provision for their expulsion; the erection of the wall; instructions concerning the mode of maintenance; the prohibition against clergymen, etc.

The contention that without integration the students cannot be properly instructed in our republican institutions will be treated later in this opinion, but it is sufficient to state here that this alone cannot be grounds for the elliptical construction requested.

Girard fully intended that the students attending his College would be segregated, not only from non-whites, but also from girls, from their natural guardians, from clergymen and from their homes, in fact from the public at large. In effect he provided that while they were in attendance at the College they would be entirely cut off from outside distractions so that they could be indoctrinated in the ideals he sought to have taught by instruction and not by experience. He envisioned a most favorable climate in which the practical studies and the moral and ethical training could be inculcated by teaching. He demanded a high standard for the teachers, both in ability and character.

In construing this will, there is no importance to be given to the fact that the testator used the word "white" with reference to the students at the College on only two occasions, whereas he used the word "orphans" frequently. Repetition of the entire phrase, "poor white male orphans" was unnecessary: Lippincott's Estate, 276 Pa. 283. In using the word "orphans" in all other instances except the two, he did

not refer to them as "male" or as "poor," for the same obvious reason. By referring to other parts of the will, we find he knew exactly how to distinguish and limit the class of beneficiaries he selected. He gave $6,000 for the construction of a schoolhouse in Passyunk Township for "poor white male children"; $10,000 to the comptrollers of *public schools* of Philadelphia (italics supplied), and $20,000 to the Pennsylvania Institute for Deaf and Dumb, and in the two latter gifts he did not specify any limitation as to color.

The use of the word "white" in the will cannot be considered as a condition attached to the gift. It is merely descriptive of the class of the objects of this bounty: Lockwood's Est., 344 Pa. 293. And there is no significance in the fact that Girard did not explicitly exclude non-whites in the same manner in which he excluded clergymen. The prohibition against clergymen is entirely negative, whereas the choice of white orphans is a positive preferential selection.

All of the arguments for an elliptical construction are little more than hypotheses based upon conjecture and are invalid in view of the clarity of purpose expressed in the will: Jacobs' Est., 343 Pa. 387; Earle Estate, 369 Pa. 52 (1951); Vidal et al. v. Girard's Executors, supra. Elliptical construction is only resorted to when the failure to delete or to add a word would lead to an absurd result: Riegel et al. v. Oliver et al., 352 Pa. 244, or "where there is a clear inference from the whole will that the words were omitted [by mistake]": Lifter Est., 377 Pa. 227, 231.

The question of whether the operation of this trust is "State action" or "individual action" under the 14th Amendment to the Constitution of the United States is one crucial issue in this case and it bears on all other issues in the case. The realm of individual action involves the exercise by one or more citizens of their "inalienable rights", including "life, liberty and the

pursuit of happiness" with which our Creator has endowed us, and also of the privileges granted by the Federal and State governments. The Constitution of the United States does not create rights; it declares them. Such declarations are the "soul" of the Constitution. Congress and the legislatures of the several states may and do create privileges within constitutional limits. Examples of privileges are relief, public education, and the ability of a citizen to transfer property at death. The powers and the machinery of the government were created and exist in large measure for the purpose of protecting the citizens in the equal opportunity to enjoy all declared rights and granted privileges without regard to race, color or previous condition of servitude. Whether declared specifically or implied in the Bill of Rights, our inalienable rights include freedom of expression, religion, assembly, private association, marriage and the home, and the place, manner, style and terms of living, occupation and travel, and all others comprehended by "the free enjoyment of all of our faculties in all lawful ways": Allgeyer v. Louisiana, 165 U. S. 578; Adair v. U. S., 208 U. S. 161, 173. Man's faculties are physical, mental and spiritual. Express inhibitions against voluntary and involuntary servitude are express protections.

The other realm, state action, occurs when some officer or body, in the exercise of a public function, deprives one or more citizens of the equal enjoyment of some declared right or granted privilege. State action is denounced as lack of due process and of equal protection of the laws under the 14th Amendment. Conversely, the same amendment denounces equally any interference by the State or by an individual citizen with actions strictly within the realm of individual action. Individual action connotes personal selectivity or discrimination whch results in segregation of the

person or thing selected from all other persons or things, whereas state action inhibits discrimination and requires conformity.

The contemporaneous orderly operation of these two forces under the Constitution distinguishes the Government of the United States and American institutions from anarchy on the one hand and from totalitarianism on the other. It has enabled this country to grow ever greater and stronger, and its people ever freer and more secure. At times these forces appear to be like the strands of a rope, uniform, and at other times, intertwined or crossed. The desired unity of operation of them in a swiftly moving and changing world is fundamentally essential and requires the constant maintenance of the requisite balance between them. In state action the essential adaptation in the maintenance of this balance is by governmental or political action, executive, legislative or judicial, or by elections or by constitutional amendment. In individual action, the accommodation is by the voluntary actions of the individual or groups directly involved, by their "daring greatly" but "wisely", individually and socially and guided by considerations of public interest. In this case there appears to be an intertwining or crossing of our political and social philosophies.

The inhuman and abhorrent vacuum in which the colored population of this country lived prior to 1861 exploded into the Civil War, resulting in the adoption of the 13th, 14th and 15th Amendments to the Constitution. The purpose of these amendments was to abolish slavery and involuntary servitude and more especially to give to the Negro equal liberty and opportunity under law, the full dignity of American citizenship. The purpose was not, however, in any sense to create another imbalance of one population group over another, or of one citizen over another by

adding anything to the right of one citizen against another: U. S. v. Cruikshank, 92 U. S. 542, 545.

The line of demarcation between State action and individual action is necessarily an undefined one. Courts, therefore, never attempt to specifically delineate the boundaries or the divisions between the two. In passing upon the complex threshold question of whether issues presented involve one realm or the other, courts uniformly determine such issues upon the facts of each case: Rice v. Sioux City Memorial Park Cemetery, Inc., et al., 349 U. S. 70 (1955). The facts of the present case are novel.

The petitioners stress two points in behalf of their averment that the operation of the trust constitutes State action. The first is that the trust is a racially restrictive covenant which cannot constitutionally be sustained by this court under Shelley et al. v. Kraemer et al., 334 U. S. 1. The second is that the applicant, as a citizen of Philadelphia, is entitled to admission to the College because the College is operated by City officials whose refusal to admit him, amounts to lack of equal protection. The Board and the amicus curiae claim the operation of the trust is not "State action" denying any right of the plaintiffs.

Shelley v. Kraemer, supra, involved two separate cases from separate states. In each case, a party to a racially restricted real estate covenant breached the terms of his covenant by selling his property to a colored purchaser. At the instance of other parties to the covenants, the State courts ordered the purchasers to vacate their respective properties. The Supreme Court of the United States reversed and held that, although standing alone, the covenants were legal and constitutional, the colored purchasers had the right to purchase and to occupy property, and that the State court judgments enforcing the covenants deprived the

colored purchasers of the equal protection of the law guaranteed by the 14th Amendment; that this was consistent with the definition of State action in Ex Parte Virginia, 100 U. S. 339 at 347:

"The constitutional provision . . . must mean that no agency of the State or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws."

Chief Justice Vinson, however, stated in the course of his opinion in Shelley v. Kraemer, supra, page 13, that the law could not force a party to the covenant to violate it. He said:

"Since the decision of this court in the Civil Rights Cases, 109 U. S. 3 (1883) the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the 14th Amendment is only such action as may fairly be said to be that of the states. That Amendment erects no shield against merely private conduct, *however discriminatory or wrongfully.*

"We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated." (Italics added.)

Prior to Shelley v. Kraemer, a State statute, which inhibited white or colored owners or occupiers of homes in segregated city blocks from selling to or permitting persons of other races to occupy homes in those blocks, was declared unconstitutional in Buchanan v. Warley, 245 U. S. 60 (1917). The latter decision was followed in Harmon v. Tyler, 273 U. S. 668 (1927) and in Richmond v. Deans, 281 U. S. 704 (1930).

In the other cases cited in the Shelley opinion, the denials involved were of jury trial, of some other rights of accused persons, of holding public office or receiving public benefits and privileges, of employment, of admission to hotels, places of entertainment and other similar places where services or property are held out to the public for hire or for sale, to the enjoyment of all of which a colored person possessed some right, the exercise of which was denied. The latter fact is likewise the basis of the nine several Acts of the Pennsylvania Assembly cited by the applicant.

In Brown et al. v. Board of Education et al., 347 U. S. 483, and Bolling et al. v. Sharpe et al., 347 U. S. 497, the issue was the right of colored boys to attend public schools on an integrated basis with white students. Prior to these two decisions, colored children, who were required under the State's compulsory education laws to attend school, had no choice but to attend a segregated colored school. The Brown and Bolling decisions did not declare that colored boys have a right to attend any private school, but merely the right, which the applicant is now enjoying, of attending a free integrated public school. The decisions did not purport to grant or affirm any right to attend any private school, whether founded and operated by an existing organization, or established under a testamentary trust, as Girard College.

The Shelley, Buchanan and related cases are readily distinguishable from the instant one, both factually and legally. For example, in those cases the sellers of the properties were independent contractors who had the right to elect to abide by or to breach their covenants. It was their breaching of their covenants which resulted in the opportunity of the colored purchasers to exercise their rights to buy and to occupy the properties. Here the Board is a fiduciary, the mouthpiece of Stephen Girard. Its decision was to

abide by the terms of the will and to refuse to admit the applicant. From the Board's viewpoint, unless the applicant can demonstrate he is a member of the class, "poor male white orphans", he has no right to admission, Soohan v. The City of Philadelphia et al., 33 Pa. 9, and no authority was presented to the board which would sustain the existence of such a right.

Among the powers reserved to the several States under the Constitution and which the States consistently have exercised, is the power to enact Wills Acts and Intestate Acts which authorize and direct the manner and form by which persons may transfer property at death. These Acts allow the widest form of discrimination or segregation. In fact, the Intestate Acts, which operate when a man dies without leaving a will, discriminate in directing the transfer of his property at death to limited classes of his next of kin. This privilege of transferring property at death is an integral part of our free enterprise or incentive system. Chief Justice Stern said in Willcox v. Penn Mut. Life Ins. Co., 357 Pa. 581, 590 (1947): "Nearly a hundred years ago it was said by this court in Ervine's Appeal, 16 Pa. 256, 263, 264, that 'If the legislature possessed an irresponsible power over every man's private estate . . . all inducement to acquisition, to industry and economy would be removed'." Some areas of that system have been determined to be within the realm of state action, several of which have been discussed hereinbefore.

The power here emanates from Girard. His right to establish this College was at the time of his death and is today as basic as all of the other individual rights hereinbefore referred to. No right or privilege of the citizen is more valued than to dispose of his property by will: Cauffman et al. v. Long, 82 Pa. 72. No decision or legislative action has been brought to the court's attention which in any way brings chari-

table trusts or gifts, inter vivos or testamentary, within the realm of state action.

No citation or authority is necessary in support of the doctrines that charitable trusts are considered sacred and favorites of the law of Pennsylvania and that our courts go to extremes to preserve them. The importance of charitable benefactions to our economy and to our society generally is exemplified by the statistics supplied by Deputy Attorney General Forer showing that the estimated total charitable benefactions in the United States in 1949 was over four billion dollars, and "we have but to look about us" to observe the substantial part that charitable institutions play in the life of our country. This is convincing evidence that voluntary action is accommodating itself to its responsibilities and that charitable bequests are an outstanding feature of public policy.

The Vidal case and all of the later appellate court decisions sustain the legality of the establishment of this private school and orphanage. In Pierce v. Society of Sisters and Pierce v. Hill Military Academy, 268 U. S. 510, it was held, inter alia, that the State under its police power cannot deprive citizens of the right to establish private schools, or deprive parents of the right to have their children attend them, or force them to attend public schools. See Connell v. Kennett Township, 356 Pa. 585, 593; Commonwealth ex rel. School District of Pittsburgh v. Bey et ux., 166 Pa. Superior Ct. 136; Commonwealth v. Beiler, 168 Pa. Superior Ct. 462, and Public School Code of March 10, 1949, P. L. 30, 24 P. S., par. 13, §1327. In Meyer v. Nebraska, 262 U. S. 390 (1923), a State statute which forbade the teaching of the German language and of other subjects in German was held unconstitutional, because it deprived the teachers of their right to teach, and the parents of the students of their right to have their children instructed in subjects not inherently harmful.

In Farrington v. Tokushige, 273 U. S. 284 (1926), an Act of the Legislature of Hawaii, which the court decided was a deliberate plan to bring private foreign language schools (whose students also attend public or other private schools) under a strict governmental control, would destroy the reasonable choice of teachers, curriculum and text books and invade the right of the parents of children to have their children educated without unreasonable restrictions, and was held unconstitutional. These cases, which enunciate principles of academic freedom, hold that the legal operation of private schools permits wide latitude and that only policies and methods which are inherently harmful are illegal.

The 13th, 14th and 15th Amendments emancipated all slaves and abolished all dominion or property rights their former owners had over and in them. The impact of these Amendments cannot, however, in any sense be held to affect the right of Girard to dispose of his property as he did in this trust. For the 14th Amendment to be given such interpretation would mean adding some other right to one group of citizens over the right of a single citizen: U. S. v. Cruikshank, supra. No authority to the contrary has been cited.

The Shelley, Buchanan and the Civil Rights Cases condemn racial discrimination in state action. Conversely, they declare individual action constitutional, "however discriminatory or wrongful." For the purposes of this case, the cited cases are evaluated by the hearing judge as follows: (1) They clearly distinguish state from individual action; (2) they hold that private conduct, however discriminatory, is constitutional; (3) since the subject matter of all of those cases was directly and exclusively racial discrimination, it follows (4) that although the latter may be wrong, it is legal and valid in individual action. Therefore, if the operation of this trust under Girard's will

be individual action, the racially discriminatory admission restriction, which is only a part of Girard's whole philosophy of segregating the orphans from all of the public as well as from their homes, must be declared constitutional.

Although the question of racially discriminatory admission policies may not have been raised in Burd Orphan Asylum v. School District of Upper Darby, 90 Pa. 21 (1879) where the objects of the charity were "white female orphans", with preference given to those baptised in the Protestant Episcopal Church, nevertheless, the decision carries great weight since it was decided after the adoption of the 14th Amendment. The Burd case was sustained in Hill School Tax Exemption Case, 370 Pa. 21, where the court said, p. 26:

"Any institution engaged in education of youth is a 'public charity' if its doors are open to the public generally or a well defined class thereof, subject to reasonable entrance requirements."

The arguments of the petitioners collectively raise the question of the inherent harmfulness of the College, a private charitable school and orphanage, because of its racially restrictive admission policies, which they claim render it illegal and unconstitutional. Although the petitioners fail to present any citation or reference to legislation in support of their position, they rely upon the following: Their major premise is that we are now living in a mixed world and that the function of education, public and private, is to prepare children to take their places in it. Their minor premise is contained in the testimony of outstanding qualified experts in sociology, psychology and education. These witnesses, some of whom also testified in the desegregation cases, stated that the modern educational concept is that it is indispensable, according to one witness, and according to others, the ideal or best policy,

that mixed racial experience exist in school and that no amount of instruction can adequately compensate for the lack of it. In this connection, it should be noted first of all that no testator has any duty to establish trusts conforming to any one else's ideas of what is best in the area in which he wishes to utilize his funds. The fact, if it is a fact, that Girard College could be improved, in curriculum or in administration, or in its choice of students, would have no bearing on its legality. Secondly, this testimony is opposed by countervailing factual and credible subjective experience testimony: Conway Will, 366 Pa. 641 (1951). The factual evidence, which is undisputed and unopposed, has two main bases: That the graduates of this institution possess exemplary records of citizenship, a number of them being most distinguished, including John E. Diemand, President of the Board and also President of the Insurance Company of North America; the academic and social studies curriculum (which is superior to that of public schools), the training in religion and the association and contacts of the students with boys of other races in athletics, conferences and other academic and cultural pursuits, both within and without the College grounds, as well as their associations on vacations at home of varying periods up to two months annually, and the total absence of any negative facts such as anti-social or racial themes or policies either in the operation of the College or the administration, including the faculty or employes, are vitally important factors. In addition, we have the testimony of Dr. Odgers and of Dr. Cooper that the current policies and methods are efficacious and useful. The countervailing evidence is, in the opinion of the hearing judge and he, therefore, finds as a fact, that not only does the College not serve a harmful purpose, but that it serves a highly advantageous and beneficial one for its student body and for the

public. As is stated above, Girard's will sets up several restrictive standards including segregation of the students from the public and from their homes. These standards may seem peculiar, but since they are in relief of the public burden, and are for the advancement of the public good, and its policies and operations not harmful, they are lawful.

The exercise of the right of selectivity of a charitable donor may be very peculiar. The donor's motives may be positive or negative, merely a matter of preference or from motives of caprice or disrespect or even aversion to the classes of the public excluded from his benefaction. Courts basically have no power to inquire beyond the express terms of the will as to motives or as to whether the purposes offend the beliefs and sensibilities of large segments of the public. In Vidal v. Girard's Executors, supra, the exclusion of the clergy was and still is repugnant to a large segment of the public. In Lockwood's Estate, supra, a gift to a "spiritualistic college to educate mediums" was sustained. The class of beneficiaries can be very narrowly limited: Barnes Foundation, 314 Pa. 122. If the purposes meet the test of being in relief of the public burdens or for the advancement of the public good, no matter how slightly, and do not contravene public policy, they are legal. "So there is no charity conceivable which will not, in its practical operation, exclude a large part of mankind, and there are few which do not do so in express terms, or by the restrictive force of the description of the persons for whose benefit they are intended. Thus, Girard College excludes by a single word, half the public, by requiring that only male children shall be received": Burd Asylum v. School District, supra.

The discrimination exercised by Girard in his will applies to not only Negroes, but also to members of all other non-white races and to non-orphans, to females,

to non-poor, to white orphans without the age limit of six to ten years at admission, and to those whose guardians will not accept institutionalization of their wards and exclusion of the clergy in their training. It follows that, just as the exclusion is common to all of these classes, the relief from the burden of supporting the students in the College is equally enjoyed by all of the people of all races and colors; also that all members of the excluded classes would be equally entitled to admission to the College were the reason propounded by the applicant valid, that he has a right to admission because his mother is a taxpayer. It would necessarily follow that all of the purposes of the will would thus be placed in jeopardy. The exclusion of all of them is implied: Wiegand v. The Barnes Foundation, 374 Pa. 149; Soohan v. The City of Philadelphia et al., 33 Pa. 9.

Even the Legislature cannot alter the dispositive provisions or remove the trustee of a trust: Warden Est. 382 Pa. 311 (1955) ; Brown v. Hummel, 6 Pa. 86 (1847). It cannot arbitrarily interfere with or destroy established property rights: Canovaro et al. v. Brothers, etc., 326 Pa. 76 (1937). See 3 Scott on Trusts, Section 367.3, p. 1972, where the author cites certain cases which hold that the doctrine of the famous Dartmouth College Case is a mere extension of the doctrine of the inviolability of charitable trusts. See, also, p. 2119 of the same volume.

Standing alone, neither the challenged provision in the will, nor its administration by any private trustee, would come within the realm of state action forbidden by the 14th Amendment.

But the petitioners then raise their second constitutional point, that its entire operation is by public officials; that the Board is appointed by the Judges of the Courts of Common Pleas; that the Board administers the trust, the City Treasurer handles the trust

funds, the City Controller has the power to audit the accounts, and being public officials they must all act in a non-discriminatory manner. The claim is then made that, since the applicant is a citizen of Philadelphia, he has the right to enter the College. The Board defends on the ground that the City's Charter and its amendments give the City three separate and distinct powers, governmental, proprietary and fiduciary, and that the Board and the City Treasurer act only in the latter capacity, while the Judges of the Courts of Common Pleas serve as a Board of Appointment.

State action is present where private parties become organs of the state, whether in the executive, legislative, administrative or judicial field, "the representatives of official power" and "delegates of the state's power", "discharging official functions." In such instances, they must treat all alike: Nixon v. Condon et al., 286 U. S. 73. They act in the name of the State and are clothed with its powers and their acts are those of the State. Where such officers deprive a citizen of life, liberty or property, they deny that other person due process and equal protection of the laws: Ex Parte Virginia, supra; Civil Rights Cases, supra; Buchanan v. Warley, supra, and other cases cited in Shelley v. Kraemer, supra.

The decisional law in cases involving the instant trust both in the Federal and the State Appellate Courts supports the theory of separation of the municipal powers principle advanced by the Board. In Vidal et al. v. Girard's Executors, supra, it was decided that the City could hold property and serve as trustee. On p. 188 Justice Story stated: "In such a case, the trust itself being good, will be executed by and under the authority of a court of equity. Neither is there any positive objection in point of law to a corporation taking property upon a trust not strictly within the scope of the direct purposes of its institution, but col-

lateral to them; nay, for the benefit of a stranger or of another corporation. . . . We know of no authorities which inculcate such a doctrine" (that the city could not serve as trustee) "or prohibit the execution of such trusts, even though the act of incorporation may have for its main objects mere civil and municipal government and regulations and powers." He held that the Pennsylvania Act of 1832 constituted an estoppel "thereafter to contest the competency of the corporation to take the property and to execute the trust, . . . by which it would seek to divest the property." See, also, Girard v. Philadelphia, 74 U. S. 1.

In Philadelphia v. Fox et al., 64 Pa. 169, the constitutionality of the Act of 1869, which supplanted the previously existing Board of Trustees and established the present Board of Directors of City Trusts and placed in its charge this and many other charitable trusts, was sustained. There, Chief Justice Sharswood said, inter alia, pp. 182 and 183: "This whole question is put at rest, and that as to one of the most important of these trusts and as to this trustee, by the opinion of the Supreme Court of the United States in Girard v. Philadelphia, 7 Wallace 14 [74 U. S. 1, 14]: 'it cannot admit of a doubt', says Mr. Justice Grier, . . . 'Where the trustee is a corporation, no modification of its franchises or change in its name, while its identity remains, can affect its rights to hold property devised to it for any purpose.' With equal plausibility might it be pretended that the acceptance by the government of the United States of the bequest of James Smithson limited the power of amendment contained in the Federal Constitution."

In Wilson v. Board of City Trusts et al., 324 Pa. 545, the question of the power of the Mayor over trusts administered by the Board under the City Charter of 1919 was decided against the Mayor. In the Fox and the Wilson cases, it was decided that the City as a cor-

poration has the power to hold property and to serve as trustee of trusts; that the Board is a part of, but a separate and independent branch of the City government and serves as trustee with the same powers and responsibilities as a private, corporate trustee and is, therefore, subject to the jurisdiction of this court; that the Mayor has no authority over the trusts except as an ex-officio member of the Board, and that the Board of Judges of the Common Pleas Courts, in appointing the members of the Board, acts merely as a Board of Appointment and not in a judicial capacity. In the Wilson case, the City Charter of 1919 contained no express exemption of the Board from its operation. It merely states in Article XIV, Section 1: "Except as herein otherwise provided, the powers, functions and duties of all executive departments, bureaus, boards, divisions, officers and employes of such cities shall continue as now provided by law." These decisions are the law of this case and are absolutely binding upon this court at this time.

The Legislature of Pennsylvania on April 21, 1949, P. L. 665, passed an act authorizing the City of Philadelphia to adopt and amend its own Charter. Pursuant to this authority the people of the City of Philadelphia, at an election held on April 17, 1951, adopted the present Philadelphia Home Rule Charter. The Preamble to this Charter expresses the nondiscriminatory manner in which the City government shall be operated and it also creates the Commission on Human Relations and defines its powers and duties. In Chapter A-1, Section A-100, of the Appendix to that Charter, certain offices, departments, boards and commissions are abolished. However, it states: "Except as otherwise specifically provided, this Charter shall not apply to the Board of Directors of City Trusts or to any institutions operated by it." The annotation states: "The Board of City Trusts is gener-

ally not dealt with by the Charter to protect its special status as a trustee." Construing this Charter in the light of the Fox and Wilson cases, it is quite clear that the declaration of non-discrimination contained in the Preamble to the Charter and the creation of the Commission on Human Relations are confined strictly to the City's governmental functions. It is equally clear that the express exemption of the Board of Directors of City Trusts is a declaration of policy by the people of Philadelphia, the stockholders of the municipal corporation, that the Board of Directors of City Trusts shall continue to serve the City in a fiduciary capacity in the faithful administration of all trust committed to its care, including the instant trust. In that capacity, it is, in the words of the Supreme Court of Pennsylvania, to remain "disassociated" and "completely severed" from the general City government.

An analogous case is Quick Bear v. Leupp, 210 U. S. 50 (1907). An Act of Congress forbade contracts for the appropriation of public funds for the education of Indians in sectarian schools. However, an Indian tribe's petition for the application of non-governmental tribal trust funds held by the Commissioner of Indian Affairs for their benefit, to the establishment and maintenance of sectarian schools, was allowed. This was held not Federal action. See, also, Work v. Lynn, 266 U. S. 161.

The law sustaining the City's power to serve as trustee of this estate under the authority granted by the Legislature is not unique. In McQuillin's Municipal Corporations (1950) Chapter II, 28.25, pp. 51, 52, 53, 54, will be found a statement of the law with supporting citations of authorities from other states practically identical in all respects with the views herein expressed. See, also, Perin v. Carey, 24 Howard, 65 U. S. 465, and dissent of Harlan, J., Berea College v. Kentucky, 211 U. S. 45.

A crucial aspect of whether the Board is performing a state function is the question: Whose property is involved? In the so-called Desegregation Cases, the property involved was public property. Similarly, in City institutions all of the property administered whether by the municipal administration or boards or commissions, independent thereof, such as Board of Public Education, Public Library, Fairmount Park, the municipal hospitals and the Gas Works, is governmental property. Here the funds come solely from Girard's estate. The possession of it literally and legally still belongs to him: Bosler Est., 378 Pa. 333; Commonwealth v. Thomas, 65 Pa. Superior Ct. 275. Any real estate or other tax exemption this trust enjoys under the Pennsylvania Constitution, Article IX, Section 1, is equally enjoyed by all other "pure charities." These exemptions cannot in any sense be held to be a public contribution to the support of the College. Although we have no jurisdiction to rule upon the question of the College's being a "pure charity", under the Pennsylvania Constitution, supra, it appears to come within the purview of the exemption, because it not only does not operate for profit (which was the test laid down in the Hill School Tax Exemption Case, 370 Pa. 21 (1952) and Burd Orphan Asylum case, supra), but also because no student or his guardian can be charged for the benefits the student enjoys: Mangione, Minor, 4 Fiduc. Rep. 517. The City, as a governmental agency, has no substantive property right in the estate whatever. Neither the Mayor nor the City Council nor any other agency except the Board has any jurisdiction over the handling or disposition of it. The Board's interest is that of bare legal title holder and administrative agent: Dulles's Est., 218 Pa. 162 (1907). Judicial and official municipal recognition of this distinction recently occurred when, upon the application of the Board, joined in by the City

Council and the Mayor, this court authorized (Girard Est., 88 D. & C. 481 (1954)) the Board to convey, and the City to accept, a tract of ground known as Girard Park, upon conveyance by base fee subject to a reverter. Neither the City nor the Board has any greater proprietary interest here than is possessed by the United States Government in the treaty and trust funds held by the Commissioner of Indian Affairs for Indians: Quick Bear v. Leupp, supra.

It is clear on this record and from the decided cases that in no sense does the Board, in the administration of the trust, nor the City Treasurer in the handling of the funds, exercise any governmental powers and, therefore, the administration of the trust does not come within the realm of state action forbidden by the 14th Amendment, as the applicant asserts. His claim based on that Amendment must be rejected.

In light of the findings and conclusions hereinbefore made that the operation of this trust is individual action, and that the property of it is exclusively that of the trust, it necessarily follows that the granting of these petitions would in fact result in the application of Girard's property to some use other than that for which he gave it and would, therefore, be taking his property without due process of law under Article I, Section 1 of the Constitution of Pennsylvania and of the 14th Amendment to the Constitution of the United States.

Reversal of this decision by the court en banc, or by an appellate court, solely upon the ground of the capacity and qualifications of the City to serve as trustee, would raise other questions which the hearing judge now considers moot. In the event of reversal, no doubt the case would be referred back to him for decision on these points. If the word "white" be deleted from the will, should the Board be permitted to remain as trustee, or should it be removed and another

trustee substituted? The latter course is specifically directed in the Vidal and Fox cases and in Abel et al. v. Girard Trust Co. et al., 365 Pa. 34, 41. This is consistent with the universal law of trusts that no trust shall ever fail for want of a trustee which the court always has the power to provide. The answer to that question may raise a further one: Will there then result a forfeiture of the trust res (other than the rents of the Philadelphia real estate reserved for the purposes of the College) provided in the will, if the trustee be found, as the Commonwealth alleges, to have "wilfully and knowingly" violated any of the terms of the trust? In turn, it follows that the Attorney General's position in this case might then be regarded as having induced and procured such a "wilful and knowing violation" by the Commonwealth, in which event the second forfeiture provided in the will might operate: namely, to the government of the United States. If the latter question arises, the government of the United States will then become a necessary party.

The petitoners have asked the court, sitting in chancery, to invoke the equitable doctrine of cy pres. It has already been decided in this opinion that the applicant has no legal right to enter the College. He, therefore, has no standing in equity: 30 C. J. S. §134; Andel v. Duquesne Street Railway Co., 219 Pa. 635.

It has also been decided herein that the operation of the College in accordance with the language of the will does not offend the Constitution of the United States, any Acts of Assembly or any decisional law. There is, therefore, a very heavy burden resting upon the Attorney General and the City Solicitor representing respectively the Commonwealth and the City.

The petitioners stress their point that the operation of this trust violates public policy. In Vidal v. Girard's Executors, supra, Justice Story stated (p. 197):

"... Nor are we at liberty to look at general considerations of the supposed public interest and policy of Pennsylvania upon this subject, beyond what its constitution and laws and judicial decisions make known to us. The question, what is the public policy of a state, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ". The chancellor having construed the applicable constitutional provisions, the pertinent Acts of Assembly and court decisions, decides that the operation of this trust does not offend public policy as so determined.

It is urged, however, by the Mayor as an ex officio member of the Board and by the Commonwealth, that if the purpose of the testator is to be fulfilled, it is reasonably necessary for the improvement of the education and training of the white boys, who now attend or may hereafter attend the College, that non-white, male orphans be admitted. The testimony in support of this proposition has been adverted to above, including the admitted facts concerning the conduct of the College and the rebuttal testimony supporting the Board's position. The argument of the Mayor and of the Attorney General is derived from 3 Scott on Trusts, Par. 399.4, p. 2113: " 'The necessity that will authorize and warrant an order from the court deviating from the exact plan as indicated by the will of the donor, need however be only a reasonable necessity and not an absolute physical impossibility.' " The foregoing doctrine is taken from Women's Christian Association v. Kansas City, 147 Mo. 103 (1898), wherein it was found that a mode of operation had failed, but the primary purpose remained unaffected. However, the necessity for any change of whatever

character cannot be determined alone by the impact of changed conditions, but it must have a direct relationship to the testator's purpose. Some purpose must have failed in one way or another.

Cy pres is the determination by a court of equity of the extent to which property may be applied to charitable purposes other than the particular purpose prescribed, and is invoked only when the court finds a valid charitable purpose, but there exists an impossibility or impracticability of carrying out the charitable intent of the testator in the particular or specific manner set forth in the will or grant. "If it is possible and practicable and legal to carry out the particular purpose . . . the doctrine of cy pres is not applicable": A. L. I. Restatement of the Law of Trusts, Section 399M. This is true even though the Court might be of the opinion that a more useful disposition of the property could be made.

A donor must have understood that in the course of time one or more of his directions as to purpose or administration may require modification. When lapse of time brings about changed conditions—the imponderable—such modification or deviation is found reasonably necessary by a court of equity, the court has the power to make such change. Before there can be a deviation, or before cy pres can be applied, it is necessary to prove a failure of purpose. In this very estate, cy pres has been defined as follows: "The meaning of the doctrine of cy pres, as received by us, is, that when a definite function or duty is to be performed, and it cannot be done in exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close approximation to that scheme as reasonably practical; and so, of course, it must be enforced. It is the doctrine of approximation . . .": City of Philadelphia v. Girard's Heirs, 45 Pa. 9 (1863). In the cited case, Chief Justice

Lowrie (p. 25) inhibits ". . . inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift for a known purpose to the prescribed or vaticinated modes of administering it. . . ."

There have been two instances in which the courts have ignored or held inoperative terms of Girard's will pertaining to administration of the trust: City of Philadelphia Trustee u/w Stephen Girard, 2 Brewster (1869) and Girard Estate, 73 D. & C. 42 (1952). In each instance the courts based their rulings on the proposition that the principal purpose of the will would be placed in jeopardy unless the deviations were permitted. We thus observe that varying administrative provisions is "deviation", whereas variations of the purpose of the trust involve cy pres. Before a court will direct deviation or cy pres, it must find a failure of purpose in one or the other aspects of the trust.

In all of the many cases in this jurisdiction and throughout the country which have been examined and carefully considered by the hearing judge, the courts refused to substitute their own judgment for that of the testator, unless there was some degree of failure of purpose. There is nothing presently to be gained by citing or discussing them, but it is interesting to note that a great many of them emanated from decisions involving this classic trust. However, one case cited by the applicant requires special comment: In re Dominion Students Hall Trust, 1947 (1 Ch. 183). There a trust established and maintained by several contributors was restricted to Dominion students of "European origin." The court eliminated a racial restriction because the retention of it would have caused a failure of the main purpose of the trust which was to benefit the Empire. However, the change was made *upon application by or with the approval of the contributors;* the court pointing out that had the trust been estab-

lished under a will, its power to make the change would have been at least doubtful.

The law of judicial review of educational policies and the power of courts to invade academic freedom have been discussed above. For the purpose of considering the doctrine of cy pres, it is here sufficient to reiterate that the present policy of non-integration is not inherently harmful to either the students at the College or to the public at large and, therefore, there has been no failure in the method of instruction or training at the College.

The chancellor paraphrases the language of Chief Justice Lowrie in City of Philadelphia v. Girard's Heirs in concluding that to grant the petitioners' request would be inverting the natural order of things by subjecting the main purposes of the will to the form of education, the actual and executed gift for a known public purpose to the scientific opinion of experts. The petitioners seek to have done by indirection what cannot be done directly, i.e., to delete the word "white" from the will.

### Decree

And now, to wit, July 29, 1955, the action of the Board of Directors of City Trusts, Trustee of the Estate of Stephen Girard, in dismissing the application of William Ashe Foust for admission to Girard College is affirmed and the petitions are dismissed, with leave to the petitioners to file exceptions to this decree within 15 days from the date hereof.

### Application of Robert Felder

Bolger, J., Hearing Judge, July 29, 1955.—Robert Felder, age 7, a Negro orphan boy, by his mother, has filed a petition in this court seeking a review of the action of the Board of Directors of City Trusts, in dismissing his application for admission to Girard College solely because he is not "white". Hon. Joseph S. Clark,

Jr., Mayor of Philadelphia, and Hon. George Schermer, Director of the Commission on Human Relations of the City, have filed a joint petition, pursuant to a resolution of City Council, joining in the prayer of the applicant. The Attorney General, representing the Commonwealth of Pennsylvania as parens patriae and as a possible remainderman, has intervened and filed a petition requesting that the applicant be admitted to the College. The Board of Directors of City Trusts has filed answers to all of the petitions stating that the applicant is not eligible for admission because he is not a "poor white male orphan".

In an opinion filed simultaneously herewith in the case of William Ashe Foust, by his mother, a companion case to the present one, the hearing judge has given his reasons for denying the prayers of the petitions therein and has entered a decree sustaining the action of the Board in refusing admission, and dismissing the petitions. The opinion in the Foust case is adopted as the opinion in the instant case.

It should be noted with reference to this applicant that he failed to qualify, in that his ability to read did not meet the requirements established by the Board for all applicants. This deficiency, however, as stated by the Board's examiner, can be remedied provided he proves his scholastic proficiency at any time prior to attaining age 10.

### Decree

And now, to wit, this 29th day of July, 1955, the action of the Board of Directors of City Trusts, Trustee of the Estate of Stephen Girard, in dismissing the application of Robert Felder for admission to Girard College is affirmed, and the petitions are dismissed with leave to the petitioners to file exceptions to this decree within fifteen days from the date hereof.

*William T. Coleman, Jr.,* and *Raymond Pace Alex-*

*ander*, for exceptants, William Ashe Foust and Robert Felder.

*Herbert B. Cohen*, Attorney General, and *Lois G. Forer*, Deputy Attorney General, for exceptant, Commonwealth of Pennsylvania.

*Abraham L. Freedman*, City Solicitor, and *Murray L. Schwartz*, Deputy City Solicitor, for exceptant, City of Philadelphia.

*James K. Baker, Sidney Schulman, Leon I. Mesirov* and *Lewis M. Stevens*, for Philadelphia Fellowship Commission, amicus curiae.

*Joseph P. Gaffney*, for Board of Directors of City Trusts, contra.

*James M. Marsh*, court-appointed amicus curiae.

### Re: Application of William Ashe Foust

LEFEVER, J., January 6, 1956.—The issues before the court are (1) whether a testator has the right to dispose of his own private property by setting up an "Orphan establishment" for the maintenance and education of a class consisting of "poor white male orphans" between the ages of six and eighteen; and (2) whether the testator's appointment of the City of Philadelphia as trustee to administer the trust created for that purpose and the City's serving as trustee of the trust constitute "state action" within the prohibition of the Fourteenth Amendment to the United States Constitution.

The case is before us on exceptions to the opinion and decree of Judge Bolger (the hearing judge), which sustained the action of the Board of Directors of City Trusts in refusing to admit the Negro applicant to Girard College on the ground that he is "not a poor white male orphan between the ages of six and ten years as required by the will of Stephen Girard". There is no need to repeat the facts which are detailed

with painstaking care in the scholarly and comprehensive opinion of the learned hearing judge. The issues will be considered seriatim.

## I

One of the most treasured rights of a free man in a free civilization is the right to dispose of his property at death as he sees fit. No right is more solemnly assured to him by law. This right is so sacred that a testator's directions will be enforced even though repugnant to the general views of society: Higbee's Estate, 365 Pa. 381. A testator is entitled to his idiosyncracies, and even to his prejudices, as part of his liberty: Cauffman v. Long, 82 Pa. 72. See McCown et al. v. Fraser et al., 327 Pa. 561, 564. The importance of this right is stated in pungent language in Brown et al. v. Hummel et al., 6 Pa. 86, 95:

"May not the hand of private benevolence be stayed and checked by the conviction that the will of the donor shall not be observed, and that even the solemn sanction of a legislative charter cannot protect or render inviolate the eleemosynary donation? . . . The most solemn act of a man's life, which is consummated by his death, is his last will and testament. By that act he makes a law for the disposition of his own property, acquired by his own industry, which, if it does not contradict the law of the country, has hitherto been considered inviolate. Shall it be so considered no longer in Pennsylvania?" The Supreme Court of Pennsylvania answered "No" to this interrogatory and declared unconstitutional an Act of Assembly which attempted to vary the terms of testator's will in setting up an orphanage.

There is practically no limit to the kinds of valid charitable trusts, nor to the various classes of beneficiaries. "We have charities for Methodist, Baptist, Presbyterian, and Episcopal ministers, charities for

foreign missions, for school-houses, fire companies, planting shade trees, hospitals, churches, students, priests, relief of the Indians, libraries, Free Masons, Odd Fellows, aged couples, old men, widows, soldiers, mechanics, merchants, actors, newsboys, and others": Benjamin Franklin's Administratrix v. The City of Philadelphia, 2 Dist. R. 435, 437. Such charities have been repeatedly sustained. So, also, a private individual or corporation has the right to establish a private school, so long as it is not inherently harmful: Pierce v. Hill Military Academy, 268 U. S. 510.

It is not the function of a court to rewrite a testator's will nor to construe his will to dispose of the testator's estate as the court might have done had it been the testator: Hogg's Estate, 329 Pa. 163; Hughes v. Federal Trust Company, 119 N. J. Eq. 502; nor to impose educational policies at variance with the testator's plans; but rather to give validity to the language employed in the testator's will: Britt Estate, 369 Pa. 450. Courts frequently disagree with the wisdom of a testator's provisions. Often these provisions seem unjust, harsh, even cruel, to the testator's family and closest friends. However, courts should not set aside wills on such grounds. Likewise, it is not the function of this Court to decide how it would have written Girard's will, no matter how sympathetic we may be with the applicant's understandable desire to be admitted to famed Girard College.

"A testator . . . may exclude any one whom he wishes, except a surviving spouse. The reason for the exclusion need not be stated by testator and will not be passed upon by a court": Wharton's Appeal, 373 Pa. 360, 369. Moreover, ". . . there is no charity conceivable which will not, in its practical operation, exclude a large part of mankind, and there are few which do not do so in express terms, or by the restrictive force of the description of the persons for whose bene-

fit they are intended. Thus, Girard College excludes by a single word, half the public, by requiring that only *male* children shall be received . . .": Burd Orphans Asylum v. School District, 90 Pa. 21, 28; see Barnes Estate, 314 Pa. 112. As stated by the learned hearing judge in the instant case, "Girard fully intended that the students attending his College would be segregated, not only from non-whites, but also from girls, from their natural guardians, from clergymen and from their homes, in fact from the public at large". To effectuate his intention of over-all segregation, Girard specifically directed the erection of the well-known wall around the institution.

Girard knew what he was doing, and did it deliberately, when he employed the words "poor white male orphans" in his will. He left $6,000 for the construction of a school house in Passyunk Township "one part thereof for poor male white children, and the other part for poor female white children of said township"; $10,000 to the Comptrollers of the public schools of Philadelphia, "for use of the schools upon the Lancaster system"; and $20,000 to the Pennsylvania Institute for the Deaf and Dumb. Significantly, he did *not* specify any color limitation in the latter two gifts. Therefore, it is clear that he intended *white*, and no other, in the pivotal phrase now before us, viz.: "poor white male orphans", and that he knew how to say *white* when he meant *white*.

To set aside, or drastically modify, the will of Stephen Girard and one of the fundamental concepts of his well-known college, which has operated so successfully for over 100 years, would not only subvert the purposes of his will, but would threaten, if not destroy, the entire structure of the law of wills in Pennsylvania. Girard's will is a model of draftsmanship. It was prepared by one of the outstanding lawyers of that day. It represents careful and protracted

thought and planning by the testator, who was not only a great financier, but was respected for his acumen and his positive and deliberate intellect.[1] The will was unsuccessfully challenged by the great Daniel Webster and other well-known leaders of the bar. Such a carefully drawn and clearly expressed will should not now be radically revised upon the ground that changing mores make it seem old fashioned or its creator out of step with the times. Jus disponendi is still cardinal and basic law in Pennsylvania: Bosler Estate, 378 Pa. 333. Girard had the right and the power to dispose of his property as he chose. Therefore, upon his death the valid charitable trusts he created became vested and immutable: Williamson Estate, 368 Pa. 343; Crawford Estate, 362 Pa. 458; and Warden Trust, 382 Pa. 311.

For nearly a century Girard College has been operated in an outstandingly commendable manner. It is a superior and well-recognized example of high standard elementary and secondary education. It numbers among its graduates leading members of the professions and the business community in Philadelphia and elsewhere. It provides an education which is the envy of the public schools. It compares favorably with the

[1] William J. Duane, Esq., the distinguished scrivener of Girard's will, "testified that 'the outlines, the bones and muscle of the Will, were all Mr. Girard's'. . . . As to the method of drawing the Will, Duane stated that he remained with Girard five or six weeks with the doors locked, and that in connection with this service all sorts of topics were discussed by Girard and Duane, including law, politics, religion, and architecture. The writing was gone over two or three times and drafts of the several sections were made. Duane further describes the procedure in a statement that a draft, when submitted to Girard, would be altered and remodeled in accordance with his own ideas, and that, after such revision, the section would be written over in its final form. Duane paid Girard a great compliment by declaring that he was 'a good judge of language—none better' ". "Stephen Girard, Founder", by Dr. Cheesman A. Herrick, former President of Girard College, 4th Edition (1923), page 143.

best private schools. There are at present 1,137 students in the institution. The number of students has been reduced from the maximum of 1,735, enrolled in 1933 and in 1939, owing to the reduction in income from the trust estate and the increased costs of operating the college. There is no shortage of "poor white male orphans". In fact, there are more qualified applicants than can be accepted and accommodated. There is, therefore, no present failure of the purpose of the trust; a fortiori, there is no ground for the application of the cy pres doctrine.

At the hearing, extensive testimony was offered by experts in the fields of psychology, sociology, education and human relations with respect to various philosophies concerning policy and method of operating educational institutions. Some of the experts urged that a student should have full oportunity to associate in all phases of life with other members of the community. However, this testimony does not affect the legal principles here involved. Moreover, it is well recognized that the subject of education generally has always been, and is today, a most controversial matter. Girard had the right to hold and to prescribe his own theories of education for Girard College.

Exceptants contend that the word "white" in Girard's will must be ignored and, in effect, deleted. They support this contention on the ground that the courts have twice authorized deviation from the exact terms of Girard's will, namely, (1) when the Philadelphia Common Pleas Court authorized the leasing of coal lands for a term of more than five years: In re Petition of City of Philadelphia, Trustee, 2 Brewster's Reports 462 (1868) and (2) when this Court approved the sale of real estate; Girard Estate, 73 D. & C. 42 (1950). However, these cases involved merely administrative matters; they did not concern the purpose of the trust, namely, to provide an "Orphan establish-

ment" for a specified class of beneficiaries, which is the heart of the trust. Moreover, if these administrative changes had not been permitted, the income from the trust would have been severely diminished, and the operation of Girard College would have been jeopardized. Failure to admit to the college other than "poor white male orphans" will produce no such effect.

Exceptants also urge that Girard's appointment of the City of Philadelphia, as trustee, disclosed an intention to benefit Philadelphia and all the people in it, including the applicant, and that this intention was paramount. There is no doubt that Girard intended the City to administer this trust. But this was an expedient. He wanted a perpetual trustee. Individuals are mortal. Trust companies had not yet developed as conventional administrators of trust estates. Under the Act of March 11, 1789, 2 Sm. L. 462, sec. 2, 53 PS §6362, the City was incorporated as a corporation, capable of holding property. It had perpetual existence. So Girard selected the City of Philadelphia as trustee. However, if there is any conflict between that selection and the designation of the eligible students at Girard College as "poor white male orphans", it is clear that the latter intention governed. Girard himself described the college as his "primary object". This intention, therefore, controls.

It is suggested that the City may not be able to continue to serve as trustee if only "poor white male orphans" are eligible. However, it is hornbook law that no valid trust fails for lack of a trustee. If the City of Philadelphia (through the Board of Directors of City Trusts) is unable or unwilling to continue to serve as trustee, this Court has the inherent power to appoint a substituted trustee to carry out the terms of the trust as directed by testator. It is also hornbook law that the incapacities of a trustee, individually, do not affect the validity or enforceability of a trust. The

Supreme Court of the United States has ruled in *this* case: "It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, that may furnish a ground why it may not be compellable to execute it. But that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but it will simply require a new trustee to be substitued by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust . . .": Vidal v. Girard's Executors, 2 Howard (U. S.) 127, 188. And the same court observed that if the City of Philadelphia were unable to serve under the Consolidation Act ". . . the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee.": Girard v. Philadelphia, 74 U. S. 1, 13; 7 Wallace 1, 13.

It is clear from the foregoing that the trust for Girard College is valid and that the City of Philadelphia, acting through the Board of Directors of City Trusts, may validly act as trustee. Our conclusions in this regard are fortified by the fact that the Supreme Court of the United States and the Supreme Court of Pennsylvania have decided that *this* trust creating Girard College as a school for "poor white male orphans" is valid, and that the City of Philadelphia is a proper trustee of *this* trust: Vidal v. Girard's Executors, 2 Howard (U. S.) 127; Girard v. Philadelphia, 74 U. S. 1; 7 Wallace 1; City of Philadelphia v. Girard's Heirs, 45 Pa. 9; Philadelphia v. Fox, 64 Pa. 169; and Wilson v. Board of Directors of City Trusts et al., 324 Pa. 545. Moreover, the Supreme Court of Pennsylvania has decided that the Act, creating the Board of Directors of City Trusts and placing the administration of the trust in its hands, is valid and constitutional: Philadelphia v. Fox et al., 64 Pa. 169. Significantly, despite the eloquent and extensive argument of the

distinguished lawyers who represented Girard's heirs, the Supreme Court of the United States held valid the provision forbidding the admission of the clergy to the college, and notwithstanding this unusual exclusion ruled that the City of Philadelphia could validly serve as trustee. Viewed in the light of the strong feelings and prejudices upon the subject of religion in 1844, this ruling of the Supreme Court of the United States is persuasive that a trust for "poor white male orphans" is valid today.

It is patent, therefore, that the well-settled law of wills, property and trusts in Pennsylvania establishes the validity of this trust and the right and power of the City of Philadelphia (through the Board of Directors of City Trusts) to serve as trustee. Accordingly, the terms of the will must be upheld unless they contravene an overriding provision of the Constitution of the United States.

## II

Exceptants argue that the City of Philadelphia, as "a governmental body even when it acts in its fiduciary or proprietary capacity is subject to the constitutional restrictions required by the Fourteenth Amendment.[2] Therefore, any governmental agency is unable to remain as trustee if racial exclusion is continued at Girard College". This is novel doctrine. Stripped to bare bones, the argument is that the presence of the

---

[2] The Fourteenth Amendment to the United States Constitution provides:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

City of Philadelphia in this case, as trustee, constitutes "state action", and requires that, as trustee of a privately financed trust, the City must open the testator's bounty to the public, rather than limit it to those specified by him in his will.

The fallacy in exceptants' position is their contention that Girard College should be regarded as a public school. It is not. Girard College is a private school. It is more than that—in Stephen Girard's own words it is an "Orphan establishment", where the objects of testator's bounty receive not only an education but also lodging, board, clothing and all of the necessities of life. The trust estate was created solely from the private property of Girard. Girard College was not established and it has never been operated at public expense. Every dollar expended for construction, maintenance and operation of Girard College and for the education, maintenance and support of the students has come, and must come, from Girard's estate. Not one penny of the trust estate has come from the City of Philadelphia, from the Commonwealth of Pennsylvania, from any other governmental body, nor from any source other than Stephen Girard. This privately established, privately financed, and privately maintained "Orphan establishment" cannot be equated to a publicly financed and publicly maintained school.

The City of Philadelphia, in its governmental capacity, does not provide any one with the opportunity to attend Girard College. The city offers no privileges and grants no rights. Like all corporations, municipal and private, it derives its authority to act as a corporation from the State. However, the City simply performs the duties of a trustee. The City acts for Girard; its position is functional—to carry out Girard's intent. The City acts because of its fiduciary power and duties, not because of any State function or power. The possession of the City, as trustee, is the possession

of the testator, Girard. Moreover, Girard College is not limited in its admissions to residents of Philadelphia. In fact, Girard expressly directed that preference be given in order (1) to applicants born in Philadelphia, (2) to applicants born in other parts of Pennsylvania, (3) to applicants born in New York City and (4) to applicants born in New Orleans.

The fact that the City is before this Court in two capacities, namely (1) through the Board of Directors of City Trusts which supports its action in rejecting the applicant for admission to Girard College, and (2) through the City Solicitor who opposes such action, is strong evidence of the City's dual capacity, and of the fact that its actions as trustee of this trust are not the same as, nor governed by, its actions as a municipal government. On no other basis could this Court tolerate the anomaly of the City being on both sides of this case.[3] The electorate of Philadelphia has recognized this duality, and expressly directed that the Home Rule Charter does not apply to the Board of Directors of City Trusts.[4]

---

[3] There is a serious question as to the right of the City of Philadelphia, acting through the Mayor and the Commission on Human Relations, to appear as a party litigant in this case. However, there is no doubt as to the standing of applicant, William Ashe Foust, nor the Attorney General of Pennsylvania. Accordingly, we have resolved the doubt in favor of the City; we have permitted it to appear; and we have given careful consideration to its position and the oral argument and brief which it presented in support thereof.

[4] Section A-100 of "Philadelphia Home Rule Charter", adopted April 17, 1951, provides:

"Except as otherwise specifically provided, this charter shall not apply to the Board of Directors of City Trusts and to any institutions operated by it."

And the annotation thereto states:

"4. The Board of City Trusts is generally not dealt with by the Charter to protect its special status as a trustee."

It follows that it cannot be said in this case that the City "acts in the name of the State and for the State, and is clothed with the State's powers" as in Raymond v. Chicago Union Traction Company, 207 U. S. 20, 36. The City exercises Girard's power of selection when it excludes from Girard College, not only the applicant, but also all others who do not meet the requirements for admission specified by Girard. In so doing the city is not applying any State policy nor applying any State or city power. It is simply limiting participation in Girard's bounty to those selected by Girard himself. Such action, with respect to this "Orphan establishment", built, maintained and operated exclusively at the expense of a private individual's estate, is not "state action" within the meaning of the Fourteenth Amendment to the Constitution of the United States. Consequently, exceptants' case must fail because "That amendment erects no shield against merely private conduct, however discriminatory or wrongful": Shelley v. Kraemer, 334 U. S. 1, 13.

Exceptants cite numerous cases in support of their position. However, they have not demonstrated that this case comes within the prohibition of the due process clause or the equal protection clause of the fourteenth amendment. As the court-appointed amicus curiae aptly states, there is no case exactly in point. Several are superficially analogous to the instant case, but, on careful analysis, are readily distinguishable. Brown et al. v. Board of Education et al., 347 U. S. 483, involved the right of admission to *public* schools, created and supported by public funds, not admission to a *private* school, created and supported entirely from the principal and income of a private individual's estate. Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F. (2) 212 (C. C. A. 4th) involved the right of employment in a library started by a private

settlor, but substantially improved and expanded, and almost entirely maintained by *public* funds on city-owned land; in fact, today it is the *public* library of Baltimore. In Shelley v. Kraemer, 334 U. S. 1, litigant had an initial *right*, viz., to own private property, his home which he bought and paid for; there is no such initial right here; admission to Girard College is a privilege based upon selection among the available qualified applicants within the class. Nixon v. Condon, 286 U. S. 73; Terry v. Adams, 345 U. S. 461, and similar cases, involved the exercise of State power and performance of State functions by political parties; these cases contrast with the instant case because the crucial finding there that private parties had become "organs of the state", "delegates of the state's power", and "the repositories of official power", who "discharged their official functions", simply do not apply to the facts in this case.

It is apparent, therefore, that the functioning of the City of Philadelphia, acting through the Board of Directors of City Trusts, as trustee of Girard's will, does not constitute "state action" within the meaning of the fourteenth amendment.

### III

The will of Stephen Girard has become a legend in Pennsylvania and in the United States. The number of times Girard's will and Girard College are referred to in the books is legion. The will is mentioned in every leading treatise on "trusts". Girard's will and the basic decisions sustaining it are cited as illustrative of the doctrine of charitable trusts in America. The principle therein established, that a testator may dispose of his private property for the benefit of any class he may select, is firmly imbedded in the law of this country.

As stated in Benjamin Franklin's Administratrix v. The City of Philadelphia et al., 2 Dist. R. 435, 437: "Stephen Girard's great estate, which now houses, feeds, clothes, and educates 1,500 orphan boys, would, if any strained definition of the word 'public' were allowed to prevail, be crippled by taxation; yet only a class, and that a small class of people can obtain the benefit of it. Girls are excluded; boys whose fathers are living, are excluded; men and women are excluded; in short, all but 'poor white male orphans' are excluded. Nevertheless, it is a great charity, and withstood numerous and persistent attacks in the courts of Pennsylvania and of the United States, *until now it is fixed, firm, and as unmovable as a rock:* Vidal v. Girard's Executors, 2 Howard, U. S., 127; Philadelphia v. Girard's Heirs, 45 Pa., 9; Girard v. Philadelphia, 7 Wallace, 1." (Italics supplied.)

Truly, Girard's will and Girard College are bed rock of charitable trust law in the United States. This should not now be overturned. "Poor white male orphans" in Girard's will today, just as yesterday, means "poor white male orphans". Applicant does not fall within that description, and no legal reason has been shown why the trust should not be continued in accordance with Girard's directions.

Accordingly, the exceptions are dismissed, and the decree nisi is confirmed absolutely.

### Re: Application of Robert Felder

LEFEVER, J., January 6, 1956.—Contemporaneously herewith we are filing an opinion in the companion case, "Application of William Ashe Foust". The facts in the instant case are substantially the same. Therefore, the same decision is in order. Accordingly, for the reasons set forth in that opinion, which we incorporate herein by reference, the exceptions are dismissed, and the decree nisi is confirmed absolutely.