## Brown et al. *v.* Hummel et al.

G. F. by his will, dated May 12, 1806, devised his estate to trustees therein named, and for the uses and trusts therein mentioned, and to establish a perpetual charity for the education of poor orphans, and directed that an orphan-house should be erected at a designated place, and that it should be called "*Emaus.*"   For the perpetuation of the trustees, the testator directed, that the places of those who died, resigned, or removed from the county of Dauphin, should be supplied by the election of a freeholder, and resident of the county of Dauphin, who was also to be a regular member of some one of the churches of the Protestant religion, to be made by the remaining trustees, which election was to be subject to the approval of the Court of Common Pleas of Dauphin County.

Trustees were regularly constituted under the said will, until 1835, when the then existing board resigned; and, thereupon, their places were supplied by appointments made by the Supreme Court.   In 1839, the then acting trustees, and the principal of the orphans' house, were incorporated by act of Assembly, under the style and title of " The Principal and Trustees of the Emaus Orphan-house," with perpetual succession, &c.; and, accordingly, trustees and principal were regularly constituted until the 21st of April, 1846, when an act of Assembly was passed, authorizing the Court of Common Pleas of Dauphin county to appoint the trustees, on the nomination of the respective synods of the Lutheran church, lying east and west of the Susquehanna river, in this state.   In pursuance of this act of 1846, trustees were nominated by the said synods, and appointed by the said court, on the 7th of September, 1846.   *Held,* that the trustees elected under the provisions of the will of G. F. and the act of incorporation of 1839, had vested rights under said will and act of incorporation; that in addition to their own franchises, they were the depositaries and guardians of the vested rights of the beneficiaries, the orphan children; that they were divested of those rights, privileges, and franchises, by the act of 1846,

without a trial by due course and process of law; by reason of which, the solemn contract of the state, as contained in the charter of 1839, was impaired, and that, therefore, the act of the 21st of April, 1846, was unconstitutional and void.

An act of Assembly, whereby a man's property is swept away from him without a hearing, trial, or judgment, or the opportunity of making known his rights, or producing his evidence, is not " *the law of the land,*" within the meaning of the 9th section of the declaration of rights, as set forth in the Constitution of Pennsylvania. By the " *law of the land,*" is meant the law of an individual case, as established in a fair, open trial, or an opportunity given for such a trial in open court, and by due course and process of law.

IN error to the Court of Common Pleas of Dauphin county.

*June* 25. This was an action of ejectment, for five farms, a grist-mill, saw-mill, &c., containing in the whole 900 acres, and also a number of lots in the borough of Middletown, brought by David Hummel, William Dock, Jacob Seiler, and Jacob Reel, trustees of the " Emaus Orphan-house," against Dr. Mercer Brown, late principal, and Benjamin Jordan, John Pricer, and Daniel Kendig, late trustees of the " Emaus Orphans' House," the plaintiffs in error, who were defendants below. A case was stated in the nature of a special verdict, for the opinion of the court below, with leave to take a writ of error, without affidavit or bail.

The material facts of the case, as disclosed in the case stated, and as stated in the opinion of this court, delivered by his honour, COULTER, J., are the following:

George Fry made his will on the 12th day of May, 1806, and died soon afterwards. On a feigned issue to try the validity of this will in a circuit court, held for the county of Dauphin, judgment was rendered in favour of the will on a trial before the Chief Justice of the Supreme Court, on the 16th of April, 1807. The estate was devised to trustees for the uses and trusts mentioned in the will; the object of which, as therein set forth, was to establish a perpetual charity for the education of orphans, and, at the discretion of those to whom the direction of the institution was confided, for poor children whose parents were still living. The testator directed that the orphan-house should be erected on a spot indicated in the will, where a building was commenced, and that it should be called " Emaus." Detailed instructions and rules are set forth in the will, for the perpetuation of the trustees, and the selection of the principal and tutor; and a desire expressed, that the institution should be incorporated. In the year 1835, the trustees, upon an alleged abuse of trust, were cited to appear before the Supreme Court; whereupon the then trustees resigned, and their places were supplied by an appointment made by the said court. In the year 1839, the then existing trustees, and the principal of the orphan-

house, were incorporated under the name and title of the "Principal and Trustees of the Emaus Orphan-house:" the act declaring, that by that name and title they and their successors shall have *perpetual* succession.

The defendants in this action of ejectment are the trustees, *now regularly constituted under the provisions of the will*, and claim the right to hold the possession, by virtue of the provisions of the will and the act of Assembly.

The plaintiffs claim a right to recover possession by virtue and authority of an act of Assembly, passed the 21st day of April, 1846 ; in the preamble to which it is alleged, that experience has proved that the repairs and improvements of the farms, mills, and houses, together with the salary of the principal, consume nearly the proceeds of the estate under existing arrangements, and that the estate is still in debt upwards of $9000. The first section enacts, "that the Court of Common Pleas of Dauphin county are hereby authorized to appoint two reputable citizens of said county as trustees under the will of George Fry, to serve for two years, and two such citizens under said will, to serve for four years, on the nomination of the respective synods of the Lutheran church, lying east and west of the Susquehanna, in this state."

In pursuance of the last-mentioned act of Assembly, the respective synods therein named, nominated to the court of Dauphin county the plaintiffs in this suit, as trustees, who were appointed by said court on the 7th day of September, A. D. 1846, who thereupon instituted this action of ejectment. Whether they are entitled to recover or not, is the question to be resolved by this court.

A full copy of the will of George Fry, deceased, will be found in Ex parte Cassel *v.* Spayd, 3 Watts, 408. Judgment below was rendered for the plaintiffs : whereupon, the defendants sued out this writ of error, and assigned the judgment of the court below for error here.

*McCormick* and *Penrose*, for plaintiffs in error, assumed the following positions on the argument: The provision of the amended constitution, directing the first legislature to provide for the election or appointment of all officers for whose election or appointment provision had not been made by the said instrument, was merely directory ; and such provision might have been made by a subsequent legislature ; Commonwealth *v.* Clark, 7 Watts & Serg. 127. The classification of associate judges, made by the first

legislature after the adoption of the amended constitution, was binding, and could not be altered by a subsequent legislature; Leib v. Commonwealth, 9 Watts, 200. The legislature cannot take the property of one individual and give it to another, either with or without compensation; Norman v. Heist, 5 Watts & Serg. 171. *Here*, they cited the act of 20th June, 1839, incorporating the "Emaus Orphan-house;" Pamph. Laws of 1839, p. 347; and also the act of the 21st of April, 1846, giving the power of appointing the trustees to the Court of Common Pleas of Dauphin county, on the nomination of the Lutheran Synods; Pamph. Laws, 1836, p. 471. An act authorizing trustees to sell lands on ground-rents, which were devised subject to contingent cross-remainders, is constitutional; Norris v. Clymer, 2 Barr, 277. The act changing the mode of election of the trustees of the Germantown School is constitutional only because the power to alter was reserved in the first charter; Commonwealth v. Bonsall, 3 Whart. 559, 566. A charter is a contract; and the legislature have no power to alter it against the consent of the parties, if it be a private corporation; Dartmouth College v. Woodward, 4 Wheat. 624; Philips v. Bury, 1 Ld. Raym. 5; 2 Term Rep. 346. The legislature have no power to take property from corporations confirmed by previous laws, and give the same to the state, or to any other purpose; Territ v. Taylor, 9 Cranch, 43; 3 Story on Contracts, sec. 1384, 1385. The rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute; People v. Manhattan Company, 9 Wend. 351; 3 Mass. 146; 2 Kent, 305.

*Ott* and *Fisher*, contrà.

*June* 28. COULTER, J. (after stating the case.)—Before I proceed to examine the question involved in this case, I deem it proper to state, first, that if the defendants, by nonuser or misuser of their corporate functions, had forfeited their offices, ample remedy was afforded by due course of law, in which all parties would have had an opportunity of being heard. The courts of the Commonwealth have ample power to afford redress and remedy, considering them either as corporators or trustees. Secondly, The act of 1846 makes important alterations in the will of the testator. Thus, the will provides that the places of the trustees, as they die, resign, or remove, shall be supplied by elections, held by the trustees themselves; and if their choice shall be approved by the court of Dauphin county, the appointment shall be valid. The act vests in the synod of the Lutheran church the power of nomination, and, in

effect, that of appointment. The testator directs that the *rents and profits* of his real estate shall *in perpetuity* be applied to the charity, and that no part of the estate devised to the trustees shall ever hereafter be sold or severed from the orphan-house, but shall remain united thereto whole and undivided for ever. The act of 1846 directs that seventy acres of it shall be sold, and severed from the charity. The will provides that the trustees shall be of good moral and religious character, and be members of some one of the Protestant churches. The act gives the nomination to the Lutheran church. Other alterations are made, which I omit to specify. The act of 1846 is itself quite explicit on the subject, because the last section provides that all provisions of the will of George Fry, and of former acts of legislation relating thereto, *not altered* by this act, *nor inconsistent* with it, shall remain in full force and virtue. With these preliminary observations I proceed to examine the validity of the law of 1846, upon which the claim of the plaintiffs is based.

The constitution of the state of Pennsylvania vests the powers of government in three departments—legislative, executive, judicial; and each of these, as well by the express terms of the instrument as by common right and the liberty of the citizens, are confined within the limits of their respective and appropriate spheres of action. If this court should attempt to issue general edicts, without confining itself to hearing and adjudicating cases brought before it by the usual process of law, it would be guilty of usurpation; and its rescripts would fall dead and harmless upon society. So if the Executive were to assume the functions of a Roman prætor, and decide causes between parties litigant, he would be a usurper of undelegated power. And if the legislature, touched by that human infirmity and liability to error which is incident to our nature, should overstep the barrier of the constitution, their resolves and their enactments would lose all valid power, and be of no more account in their operation upon the private rights of individuals, than the unauthorized proceedings of any other assemblage of men. It is by and from the Constitution alone they derive their power; and out of its pale they are shorn of their strength, and are but common men. The bill of rights, which is for ever excluded from legislative invasion, declares that the trial by jury shall remain as heretofore, and the right thereof be inviolate; that all courts shall be open, and that every man shall have redress by the due course of law; and that no man can be deprived of his right, except by the judgment of his peers or the law of the land.

What, then, is the law of the land, as it relates to the protection of private rights? Does it mean bills of attainder in the shape of an act of Assembly, whereby a man's property is swept away from him without hearing trial, or judgment, or the opportunity of making known his rights or producing his evidence? It certainly does not. It was to guard against such things which had been common in the reign of the Stuarts and their predecessors, and with which our forefathers of the Anglo-Saxon race were familiar, that these irrevocable and unassailable provisions were introduced into the constitution. The law of the land does not mean acts of Assembly in regard to private rights, franchises, and interests, which are the subject of property and individual dominion. But it means what is clearly indicated by the other provisions of the bill of rights, to wit: the law of the individual case, as established in a fair and open trial, or an opportunity given for one in court, and by due course and process of law. "*I am a Roman citizen,*" were once words of power, which brought the proudest proconsul to a pause, when he was about to commit oppression: and the talismanic words, *I am a citizen of Pennsylvania,* secures to the individual his private rights, unless they are taken from him by a trial, where he has an opportunity of being heard by himself, his counsel, and his testimony, *more majorum,* according to the laws and customs of our fathers, and the securities and safeguards of the constitution. Sir Edward Coke defines the meaning of the words, *by the law of the land*— for they were used in *Magna Charta,* and have been sprinkled with the tears and blood of many patriots—to be a trial by due course and process of law. I do not, therefore, regard an act of Assembly, by which a citizen of Pennsylvania is deprived of his lawful right, as the law of the land. The first judgment on earth was upon summons and hearing. Where art thou, Adam? and Hast thou eaten, &c., preceded the ejectment of Adam and Eve from their beautiful inheritance, the garden of Eden. And the proudest legislator may learn wisdom from such an example. It is against the principles of liberty and common right to deprive a man of his property or franchise, while he is within the pale of the constitution, and with his hand on the altar, and give it to another, without hearing and trial by due course and process of law. I oppose against it the majestic authority of this great people, as reflected from the constitution of their own making and adoption. And here, in this court, the citizen can never claim protection from that august and high charter in vain, if its provisions cover and protect his cause.

This leads me to the inquiry, whether the defendants below were in the enjoyment of legal and vested rights, and of which they are deprived by the act of 1846, which vests them in the plaintiffs.

There can be no doubt that the legislature possess the power to alter the charters of such public bodies as concern the welfare and wholesomeness of the body politic; such as concern the administration of government, and are emphatically public. Such are the corporations of cities and boroughs, when no private right of property is involved, except incidentally, and such as can be easily reserved and compensated. But in relation to private corporations, the rule has been well established to the contrary. They are considered in the nature, and entitled to the character of contracts between the government and individuals, and are within the benefit and protection of that clause in the constitution which enacts, that the legislature shall not make any law impairing contracts.

George Fry, by this will, constituted a private charity, which was regulated throughout by the minutest rules for its dispensation and government. It was *his* charity and benevolence, and not the charity and benevolence of the state, or anybody else. *He* impressed upon it the indelible character and impress of his own mind and thoughts. And this he had a right to do. What is a man's own, he may give and bestow as he pleases, if, in doing so, he violates no rule of law. It is not pretended that the will of George Fry violated any principle of law. It was a noble and Christian gift, for noble and Christian purposes, and although he had provided for the government of the institution, he desired that it might be incorporated, no doubt with a view of giving it more stability, and for the purpose of imparting to it a more thorough aptitude of acquiring and holding property for the objects of the charity. The legislature, perceiving and appreciating the purposes of the donor, granted the charter of incorporation, to the trustees and principal, as I have stated, and covenanted that they should have perpetual succession. The trustees and principal accepted the charter, and thus a contract was entered into, mutually binding; the trustees and principal bound to observe the will of the donor, and the state bound to abide by its grant.

The corporation, or charter granted, was strictly and purely eleemosynary and private. The estate was the property of George Fry, dedicated by him *not to the public*, but to a charity limited in its design and operation and sphere, to be conducted by the rules *he* prescribed, and not by general or special law. The charter of

incorporation was only intended to aid these objects of the founder and donor; and when the state had granted that charter, according to the wish of the testator, the whole power of the legislature on that subject was expended. They could neither abolish, nor destroy, nor revoke what they had granted. The trustees and principal were accountable in another forum, by due course of law.

The beneficiaries in the *Emaus Orphans' House* are, doubtless, the orphan children to whom it is devoted; but, nevertheless, the trustees and principal have interests and franchises which are within the protection of the law. But as guardians of the trust, and dispensers of the charity, they are bound to attend to and protect the interests of the orphans, and the integrity of the will of the deceased. That the grant of a corporation for charitable purposes is a private grant, and in law considered and protected as a contract, I consider so fully established by authority, as to require only a glance at the subject. The great case of Dartmouth College *v.* Woodward, 4 Wheat. 518, sustained as it is by the great names of Marshall, Washington, and Story, would of itself be of sufficient authority. But I may add one more: The People *v.* The Manhattan Company, 9 Wend. 352, where it was ruled that even implied powers of a corporation are beyond the control of subsequent legislation, on the ground that a charter is in the nature of a contract.

The trustees and the principal, who are the officers of the corporation, and defendants in the cause in hand, before they could be dismissed for embezzlement, mismanagement, or any other reason, were entitled to hearing and trial, because they had a substantial interest within the protection of the law; not only an interest of character and reputation, but an interest and franchise of office and appointment, to which emolument was attached, and although it might be small, yet was within the law's protection.

But the most important of all our franchises—the right of an elector and citizen—cannot, in a confined sense, be called property. It is not assets to pay debts, nor does it descend to the heir or administrator. But who does not feel its value; and who but would turn pale if he thought he could be deprived of it without hearing or trial, by an act of Assembly? The very object of the charter was that a private and eleemosynary bounty of the purest character should be in the legal custody of persons who were responsible to the laws, and who would be bound to administer it in good faith. They were constituted the legal guardians of the estate, and were entitled to certain franchises, of all which they were deprived, without summons, hearing, or judgment, and by an act of

the legislature, which, with regard to them, was rather a sentence of condemnation, than a law. But George Fry did not, by his will, constitute the legislature of the state of Pennsylvania to be the administrators or almoners of his bounty, nor the Synods of the Eastern and Western Lutheran Church, to appoint whom they pleased to that function.

That the corporation was private merely and eleemosynary, no unprejudiced legal mind can deny. What public function was it to perform? How was the administration of the charity to affect the public? By what sort of political or governmental alchemy was the execution of the last will and testament of George Fry, a private man, made to attract the attention of the law-giving power?. The trustees and principal are not officers of the government, or in any manner connected with its administration. Their position is not political, and their duties are humble, such as could be imposed by the will of an individual not overgrown in point of wealth. They relate to the education of orphan children.

Such, then, was the nature of the institution and the character of the corporation which was ousted by the act of 1846 ; a corporation merely private, and the grant of which by the state was as inviolate as the patent for lands, and ought to have remained untouched and secure. Being a contract on the part of the state, accompanied by a guaranty that the charity should have perpetual succession, it was beyond the reach and control of subsequent legislatures. If it were not so, there would be no stability in government ; what was granted one year might be revoked the next ; and the halls of legislation would be converted into a *campus* where the strong and wealthy would contend against the weak, until the sense of security, stability, and repose would be banished from our institutions, and we should probably become what the states of Mexico have been, and now are.

But in addition to excluding the old trustees and the principal from their stations and their private franchises, the act of 1846, on its face, alters the will of the testator, and confirms that part not altered. Where this power was or is derived, I am at a loss to perceive. If the legislature, by *ex parte* enactment, can alter the will of a private individual, whose will shall escape? On whose will shall the hand of legislative innovation next be laid ? It is the principle and not the individual instance that is to be considered. What private charity will next be disturbed and invaded? . The will of Stephen Girard offers a conspicuous mark. How many charities in the character of hospitals, asylums, and schools, in the state, are

exposed to the same peril as the charity created by the will of George Fry? May not the hand of private benevolence be stayed and checked by the conviction that the will of the donor shall not be observed, and that even the solemn sanction of a legislative charter cannot protect or render inviolate the eleemosynary donation? If the legislature can alter one man's will, by license of the constitution, they can alter the will of every man. The contemplation of such a state of the organic law of society, is calculated to bring the minds of men to a pause. The most solemn act of a man's life, which is consummated by his death, is his last will and testament. By that act he makes a law for the disposition of his own property, acquired by his own industry, which, if it does not contradict the law of the country, has hitherto been considered inviolate. Shall it be so considered no longer in Pennsylvania? Can the legislature find warrant in the constitution for altering it at their pleasure? altering it upon what may be, perhaps, sinister representations, and without hearing those interested in its preservation. In the case at bar, against the solemn injunction of the testator, that no part of the estate shall be sold or severed from the Orphan-house, and that the profits of the estate alone shall be devoted to the charity; the act of 1846 directs that seventy acres of it shall be sold. The preamble to the act represents that the institution was indebted. But were the defendants heard on that subject? I will give no opinion as to whether the estate itself could be made liable for contracts entered into by the trustees, contrary to the will of the donor, which, being put on the record, gave notice to all persons that the rents and profits alone were subject to the control of the trustees, because that question is not necessarily involved in the case before the court. But certainly the trustees and principal ought to have been allowed a trial by due course of law, in which they might have been able to show that the debts incurred, if any, were in process of extinguishment by the application of the rents and profits. For it must be observed, that the intention of the donor, as fully expressed in his will, was that the charity was intended for the benefit of orphans in all time to come, and not merely for the present generation; and for that purpose, he directed that the estate itself should for ever remain inviolate and entire.

There is one more alteration, which seems to demand a brief notice.

By the terms of the will, sanctioned by the charter, the trustees have power to fill and supply vacancies, with this check only, that their choice shall be approved by the Court of Common Pleas: and

it is provided, that members in good standing, of any of the Protestant churches, shall be eligible as trustees. But the new act of 1846 vests the nomination, and virtually the appointment, in the synods of the Lutheran church: thus giving by law a preference to that church, which was not given by the will of the donor.

It is said in the will, that the institution will be allied to the church. But how allied? Not to the ecclesiastical government or temporal power of any church; but allied in faith, and purity, and charity. We have a key to the donor's meaning, in the use of these words in the provision which authorizes the trustees and principal to "modify the mode of tuition of the pupils of the institution to the orthodox belief of the church," which the testator, by another part of his will, seems to consider conformity to the Augsburg Confession. The constitution declares that no preference shall ever be given by law to any religious establishments. The preference to the Lutheran synods is not given by the will, and is found only in the act of 1846. A great judge has said, that general Christianity is part of the law of this country, impressed upon its institutions; in which *dictum*, speaking for myself alone, I concur with all my heart and judgment. But any preference by law, to any religious establishment as to power or property, where the individual donor has not made the preference, would seem to be against the plain words of the constitution. Looking to the exclusive tendencies of ecclesiastical establishments, we cannot say that this change would not result in a time not remote, in an entire exclusion from the direction of the institution, of all other Protestant sects, contrary to the will of the testator.

After full reflection, the court is of opinion that the will of the testator, and the charter of incorporation of 1839, must be maintained. If any abuse or mismanagement exists, the law affords ample remedy. The testator himself, looking to the possibility of a failure of trustees by death, removal for mismanagement, or for any other cause, authorizes their places, in such event, to be filled by the governor of the state, and not by the legislature, and that the trustees so appointed shall perpetuate themselves by election to vacancies as they occur.

The court has approached the consideration of the act of 1846 with great respect for the legislature by which it was enacted. Entertaining a profound deference for the law-making power, we bow implicitly to its enactments within the pale of the constitution. But *we* also represent the people: we represent their justice, their constitution, and their laws. The constitution is the emanation and

emblem of their high sovereignty. Written constitutions are the guarantees of the liberty and security of the people, and are the supreme law. To establish them, or rather to establish the right to make them, the best blood of our fathers was spilled upon the soil of the country in many a field of battle. We are bound, by every duty, to maintain inviolate the constitution of Pennsylvania, and will do it according to our best judgment. All men are liable to err, and the law-making power, with the best motives which the purest hearts furnish, may err. It is here, however, in this court, of last resort, that the private citizen must look for the preservation of his private rights. Here is the ark of his safety, and the goal of his peace: and when the humblest citizen comes into this court with the constitution of his country in his hand, we dare not disregard the appeal.

The court is of opinion, that the trustees and principal, who are the defendants below, had vested rights by the will of George Fry, and the act of incorporation of 1839: that they also, beyond their own franchises, were the depositaries and guardians of the vested rights of the beneficiaries—the orphan children; and that they were divested of those rights, franchises and privileges, by the act of 1846, without trial by due course of law: and that the solemn contract of the state, contained in the charter of 1839, was thereby impaired, and that the act is therefore unconstitutional and void.

The defendants below are lawfully in possession. The act of 1846 conferred no title or authority to enter on the plaintiffs.

The judgment of the Court of Common Pleas is reversed, and judgment for the defendants.