Catherwood Trust.

62

Argued April 25, 1961.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused August 11, 1961.

*Clarence E. Hall,* with him *Donald S. Cohan,* for appellants.

*Thomas S. Weary,* with him *Saul, Ewing, Remick & Saul,* for appellee.

*William White, Jr.,* with him *Sanford D. Beecher, Reeder R. Fox,* and *Duane, Morris & Heckscher,* for Adele S. Fretz under Rule 46.

*Paul Maloney,* for certain life tenant, under Rule 46.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, July 26, 1961:

These appeals present three problems arising under the so-called Pennsylvania Rule of Apportionment.

The factual background of these problems is relatively simple. On June 9, 1924, Mr. Catherwood created an inter vivos trust under which the First Pennsylvania Banking and Trust Company was named trustee. To this trust Mr. Catherwood transferred 1896.72 shares of the common stock of American Gas and Electric Company, now American Electric Power Company. The trust provided that the trustee hold the res, collect the income and distribute the net income in equal

shares to Mr. Catherwood's two children for life and remainder over at their death to their descendants per stirpes. Mr. Catherwood is dead but his two children (the appellants) are living.

At the audit of the trustee's third account by the Orphans' Court of Philadelphia County three apportionment problems were presented.

These problems of apportionment were:

### Problem I

When this trust was created, the *book value* of the stock was $11.76 per share and its *market value,* i.e., the value at which the stock was carried in the trustee's account was $71.77 per share. On July 16, 1948 the trustee sold 200 shares of this stock. When sold, the *book value* (i.e., *intact value*) of these 200 shares was $2352.94 and the proceeds of the sale were $7808.18 ($39.04 per share). The proceeds of the sale ($7808.18) exceeded the *intact value* ($2352.94) by $5455.24. However, the sale of this stock resulted in an actual loss to the trust of $6546.90, i.e., $14,355.08 (the *carrying value* at $71.77 per share) less $7808.18 (the proceeds of the sale). Under such circumstances should an apportionment take place of *any* part of the proceeds of the sale? The court below answered in the negative and directed the retention of the entire proceeds of the sale in principal.

### Problem II

The trustee received four stock dividends—a 5% dividend in 1951, a 2½% dividend in 1952, a 2% dividend in 1955 and a 2½% dividend in 1957. Do such small dividends belong to the life tenants or should they be apportioned? The court below held the dividends should be apportioned.

## Problem III

. On July 5, 1956, a 50% stock dividend amounting to 800 shares was received by the trustee and labeled by the Company as a "1½ for 1" split. The Company issued 6,555,540 shares of common stock having a $10 share value and $65,555,400 was transferred to the capital stock account of which $40,551,060 (61.9%) was transferred from earned surplus and $24,999,480 (38.1%) from capital surplus. When the Company issued stock dividends in 1951, 1953 and 1955, $27,600,-000 was transferred from earned surplus to capital surplus. The court below held that this 50% stock dividend did not constitute an apportionable event. The auditing judge (President Judge CHARLES KLEIN), joined by Judges LEFEVER and SAYLOR, in addition to determining the three apportionment problems adversely to the life tenants, urged upon us a re-examination of our decision in *Crawford Estate,* 362 Pa. 458, 67 A. 2d 124, looking toward the relaxation of the rigidity of the rule therein enunciated so as to permit the retroactive application of the Principal and Income Act[1] to trusts created prior to its passage. With the disposition of the apportionment problems, the court en banc was unanimous.

Our initial attention is given to the suggestion that we re-examine and overrule *Crawford* which, if concurred in, would mean the abolishment and extinction of the so-called Pennsylvania Rule of Apportionment, a Rule consistently applied by this Court since *Earp's Appeal,* 28 Pa. 368, decided in 1857. That Rule was an equitable one which at the time of its conception and for many years thereafter—under vastly different eco-

---

[1] Act of July 3, 1947, P. L. 1283 which substantially reenacted the Act of May 3, 1945, P. L. 416 (repealed), 20 PS §3470.1.

nomic conditions than those of the last several decades —strove to balance the equities between life tenants and remaindermen with the aim of protecting the interests of both.

In *Nirdlinger's Estate*, 290 Pa. 457, 462, 463, 464, 465, 139 A. 200 (1927), this Court pointed out that "[w]hen the earnings [of a corporation whose stock forms part of the trust] have been permitted to accumulate by a corporation and their proceeds invested in corporate property, in working capital, or retained as cash or its equivalent, and an extraordinary dividend is declared in stock or cash, the respective rights of life tenants and remaindermen" were adjudicated under three rules—the Massachusetts, Pennsylvania and Kentucky rules. Under the Massachusetts rule—one of convenience—all cash dividends are awarded to the life tenant and all stock dividends to the remainderman: *Minot v. Paine*, 99 Mass. 101.[2] Under the Kentucky rule, a "dividend, whether of stock or cash goes to the person entitled to receive the income at the time the dividend is declared, without regard to the time when it was earned": (*Nirdlinger's Estate*, supra, 465). Under the Pennsylvania rule "the rights of the life tenant and remainderman to an extraordinary cash or a stock dividend declared during the life tenancy are determined by a division of the dividend between the claimants so as to preserve intact the book value of the devised property (the corpus) as it existed at testator's death [or in the case of an inter vivos trust, at the time of its creation]" and the "effect of the rule is to give to the life tenant the income which has been earned since the trust came into being, but, at the same time,

---

[2] This rule was then followed by Connecticut, Georgia, Illinois, Maine, North Carolina, Rhode Island, West Virginia and the U. S. Supreme Court. See: 24 A.L.R. 29. It was also the English rule.

to preserve the value of the corpus as it was . . ., or, . . ., to preserve the intact value of the estate." (*Nirdlinger's Estate*, supra, p. 464).

The so-called Pennsylvania Rule was followed for many years in a majority of the jurisdictions in this country.

This Rule recognized an "apportionable event" to occur in four situations: (1) the distribution by a corporation of an extraordinary cash or stock dividend; (2) the liquidation of the corporation; (3) the sale of the stock by the trustee; (4) the issuance of stock rights: *Cunningham Estate*, 395 Pa. 1, 7, 149 A. 2d 72; *Jones Estate*, 377 Pa. 473, 476, 105 A. 2d 353; *Buist's Estate*, 297 Pa. 537, 147 A. 606.

In 1931, the National Conference of Commissioners on Uniform State Laws promulgated a Uniform Principal and Income Act which was enacted by the Legislature of this Commonwealth on May 3, 1945. That Act rejected the Pennsylvania Rule and adopted the Massachusetts Rule.[3] Therefore, as to *all* trusts created since May 3, 1945, the Massachusetts Rule is now applied.

Both the 1945 and 1947 Acts provided that their provisions should become effective upon enactment and

---

[3] In a Prefatory Note to the Uniform Principal and Income Act the Commissioners stated: "When the first draft of the act was presented, the Conference voted to follow the so-called Massachusetts rule of awarding cash dividends on corporate stock to income and share dividends to principal, thereby rejecting the Pennsylvania rule, or one of the several variations of it, requiring some apportionment between the two funds. Experience has shown that, however praiseworthy the intent, the latter rule is unworkable, since neither trustee nor court has the means to value the corporate assets in such way as to secure the fair adjustment aimed at. Consequently the majority of the large commercial states have already favored the former and more convenient rule . . ."

should apply to *all* trusts *"theretofore* or thereafter made or created". (Emphasis supplied).

In *Crawford Estate,* supra, this Court was called upon to determine whether the Act of 1945 could constitutionally receive a retroactive application to trusts created prior to its enactment. In *Crawford,* a testator, who died in 1935, placed his residuary estate in trust to pay the income, under spendthrift provisions, to his daughter for life and provision was made for distribution of the corpus after the daughter's death. *The testator directed that all stock dividends should constitute principal.* After the effective date of the 1945 Act. but prior to the effective date of the 1947 Act, the trustees received stock dividends from three corporations and sold other corporate stock and subscription rights. The court below held that, under the Pennsylvania Rule, the life tenant had a *vested right* to receive, as income, an apportionment of the stock dividends and the gains from the sale of the stock and subscription rights.[4] On appeal, the remaindermen contended that the interest of a life tenant in accumulated unpaid corporate earnings and profits, under the Pennsylvania Rule, was a contingency and expectancy which the legislature could constitutionally modify or extinguish: the life tenant maintained that, by reason of the Rule, her interest in accumulated unpaid corporate earnings and profits was a vested property right which was beyond the power of the legislature to constitutionally alter or extinguish. This Court held that the decisional law embodied in the Pennsylvania Rule established in the life tenant a *vested property right* and that the provisions of the 1945 Act providing for its retroactive

---

[4] Because such items constituted "income" under the Pennsylvania Rule, the directions of testator that stock dividends be treated as principal was ignored on the ground such direction violated the statute against accumulation of "income".

application to trusts created prior to the Act were constitutionally inhibited by Article I, §§1 and 9 of the Pennsylvania Constitution and the 14th Amendment to the U. S. Constitution.[5] In support of its position that a retroactive application would be violative of the Pennsylvania Constitution, reliance was placed on three decisions: *Brown v. Hummel*, 6 Pa. 86; *Palairet's Appeal*, 67 Pa. 479; *Willcox v. Penn Mutual Life Insurance Co.*, 357 Pa. 581, 55 A. 2d 521. An examination of those decisions reveals their inapposition to this type situation. In *Brown*, we held that will-appointed trustees had vested rights and that a statute which summarily removed them and appointed other trustees was invalid. In *Palairet*, we held that a statute which provided for the extinguishment of ground rents effected a deprivation of vested property rights for a nonpublic use and was, therefore, invalid. In *Willcox*, The Community Property Law of July 7, 1947,

---

[5] Section 1 of Article I, of the Pennsylvania Constitution—extremely general in nature—provides: "*Section 1. Natural rights of mankind.* All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Section 9 of Article I of the Pennsylvania Constitution applies to criminal prosecutions. "*Sec. 9. Rights of accused in criminal prosecutions*: In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." The Fourteenth Amendment to the United States Constitution states, inter alia: "No State shall . . . deprive any person of . . . property, without due process of law . . ."

P. L. 1423 was held unconstitutional because, inter alia, it effected a deprivation of vested property rights for a nonpublic use. The rights therein held vested and beyond the reach of legislative interference were rights in property, whereas the right claimed in *Crawford* was to a rule of law and a method of interpretation.

In *Crawford*, no federal cases were cited to support the assertion that a retroactive application of the Act would be in violation of the 14th Amendment to the U. S. Constitution. *Tidal Oil Co. v. Flanagan*, 263 U. S. 444, 450-451, and cases therein cited would indicate the contrary.

On the same day *Crawford* was handed down by this Court, *Pew Trust*, 362 Pa. 468, 67 A. 2d 129, was decided. In *Pew*, relying on *Crawford*, we held that the retroactive provisions of *both* the 1945 and 1947 Acts were unconstitutional when applied retroactively to trusts created prior to their passage. References to our holdings in *Crawford* and *Pew* were later made in and affirmed in *Steele Estate*, 377 Pa. 250, 103 A. 2d 409; *Jones Estate*, 377 Pa. 473, 105 A. 2d 353. Finally, in *Warden Trust*, 382 Pa. 311, 115 A. 2d 159 we decided that a life tenant had a vested property right in extraordinary dividends declared on stock *acquired after* the effective date of the 1947 Act and that such Act could not be constitutionally applied to stock acquired by trusts created prior to the Act even though the acquisition of such stock took place after passage of the Act.

The present situation of the law constitutes an "apportionment morass" as President Judge Klein so aptly stated. If a trust was created prior to May 3, 1945, the Pennsylvania Rule of Apportionment now governs: if a trust was created thereafter, the Massachusetts Rule, codified by the legislature, governs. Or-

phans' courts *now* have three different sets of apportionment formulas to apply: (1) for trusts created prior to May 3, 1945; (2) for trusts created between May 3, 1945 and before July 3, 1947; (3) for trusts created after July 3, 1947.[6] Under the present state of the law the Pennsylvania Rule *must* be applied to all trusts created prior to May 3, 1945: its application will continue until the last of such trusts terminates, conceivably many, many years in the future.

In determining whether the Principal and Income Act can be applied retroactively to trusts created prior to May 3, 1945, we must consider solely the *legality* from a constitutional viewpoint of so doing: if no constitutional barrier interposes to prevent such retroactive application, we must carry out the legislative mandate which made the provisions of the Act applicable to trusts "theretofore", i.e., prior to the effective date of the Act, created. The constitutionality of a retroactive operation of the Act will depend on the existence or nonexistence of any vested property right in the life tenants or remainderman subject to interference by the legislative enactment.

Certain principles of law are beyond dispute: (1) a gift of an equitable life estate in income or of an estate in remainder does constitute a grant of a vested property right of which the recipients cannot be divest-

---

[6] If the legislature should amend (or repeal) the Principal and Income Act of 1947, the Orphans' courts would then have four different sets of apportionment formulas to apply, depending upon the creation dates of various trusts. If, over a period of years, the legislature should amend the Principal and Income Act of 1947 five times, the Orphans' courts would have seven differing apportionment formulas to keep straight and apply; if the Act were amended 10 times, they would have twelve differing formulas to understand and apply. The situation is bound to get worse; it can never get better. Unless, that is, *Crawford Estate* is overruled.

ed by legislative action; (2) a vested property right cannot exist in a rule of law, although a rule of law may establish a vested property right; (3) where an interest is declared vested by this Court, such interest cannot be altered or extinguished by the retroactive effect of any statute. That these life tenants have a vested property right in the *income* from this trust cannot be questioned. Stated otherwise, if there be *income* arising from the trust, in such *income* the life tenants have such a property right that brooks no legislative interference. The present Act in nowise alters or extinguishes a right to the income arising from the trust.

It does not follow, however, that these life tenants have any vested interest in the accumulated unpaid earnings of a corporation, the stock of which is held in the trust or a vested interest in any particular apportionment formula for the ascertainment of such earnings. Even though a corporation be highly successful, its earnings may never reach either the dividend stage or an earned surplus account. Corporate earnings may be siphoned off in innumerable ways: in salaries, bonuses, advertising, plant expansion, research, building up of inventory, and through a myriad of other expenses and investments. Reserves may be set up for countless objects and these reserve accounts credited instead of the earned surplus account. How great a corporation's accumulated earnings on its books are and, indeed, whether the corporation shows any accumulated earnings at all is a function of the particular accounting procedure employed by the corporation. It would be just as logical to reason that the life beneficiary of a trust has a vested interest in the particular accounting procedure employed by a corporation at the date that one or more of its shares become a part of the trust corpus as to reason that the

life beneficiary has a vested interest in a particular apportionment formula to ascertain the accumulated earnings of the corporation.

In *Will of Allis,* 6 Wis. 2d 1, 94 N.W. 2d 226 (1959), the Supreme Court of Wisconsin expressly rejected the whole rationale of *Crawford Estate,* stating: "It is fundamental that the life beneficiary possessed no vested property right in the earnings of a corporation, shares of whose stock constituted part of the portfolio ·of investments of the trust at the time of the enactment :of the Wisconsin Uniform Principal and Income Act, prior to a declaration of a dividend by the board of directors payable therefrom. Estate of Gerlach (1922), 177 Wis. 251; 256, 188 N.W. 94. We consider it to be equally clear that she also has no vested property right in the rule with respect to the allocation of corporate stock dividends, which had been established by court decision and was in effect at the time of the death of the testatrix. Therefore, it is our considered judgment that the legislature could change such rule with respect to any stock dividends subsequently declared without violating the due-process clause of the Fourteenth amendment." This reasoning appears eminently sound.

The claimed vested interests of these life tenants is somewhat akin to the claimed vested interests in *Com. ex rel. Fortney v. Bartol,* 342 Pa. 172, 20 A. 2d 313. In that case, five volunteer fire companies had for many years received annual appropriations from the township. In 1934 and 1935 the appropriations were unpaid and an agreement was entered into that each year thereafter $3000 would be paid to the five companies out of tax levies and appropriations in such amounts were made thereafter but not paid. The township budget in each of the years set forth an appropriation for the fire companies and, by reason of such ap-

propriations, the fire companies claimed a vested interest. This Court said: "The budgetary appropriations did not create in [the fire companies] a vested right in any fund". No more does an allocation of accumulated unpaid earnings by a corporation to an earned surplus or other account give these life tenants any vested right in such earnings.

In *Turley v. J. Hancock M. L. Ins. Co.*, 315 Pa. 245, 173 A. 163, we stated: "Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest." Such rights these life tenants have in the income from this trust but they have no rights to accumulated unpaid earnings of a corporation nor to any particular mode or method of ascertaining what is or is not *income*. To hold otherwise would produce absurd results. As appellee points out in his brief, when the Catherwood trust was created in 1924 the proceeds of a stock sale were considered as principal (*Kemble's Estate*, 201 Pa. 523, 51 A. 310) yet three years later proceeds of the sale of stock were declared apportionable (*Nirdlinger's Estate*, supra). Did these remaindermen in 1924 have a constitutionally protected interest in the proceeds of the sale of stock which in 1927 was taken from them and given to life tenants? Such ephemeral and uncertain rights which have arisen under the Pennsylvania Rule certainly cannot come within the class of constitutionally protected vested rights.

While *expediency* can furnish no reason or basis upon which to determine the constitutionality of the retroactive operation of the Act, we cannot refrain from noting the unworkability of the Rule under present day economic conditions. In *Cunningham Estate*, supra, p. 11, noting the unworkability of the Rule, we refused to extend its application to events other than

those recognized as apportionable prior to the effective date of the 1945 Act, and we therein stated: "Present day economic conditions, particularly in the corporate field, present a drastic contrast to the economic conditions in existence at the inception of and during the formative years of the Rule, and corporate practices plus multiplication and extension of taxes has made the application of the Rule even more difficult and often unworkable. The complexities, the uncertainties, and the difficulties which are inherent in the application and administration of the Rule have too often in these modern times created confusion, injustices and glaring inconsistencies. The essential fairness and equity of the Pennsylvania Rule was beyond question. The basis for its rejection and abandonment by legislation is the fact that changes in corporate practice have, in many instances, rendered unworkable the Rule. In recent years the ingenuity of corporate management, seeking to achieve various ends such as broadening or enhancing the market for its stock, effect tax savings, etc., has produced a complexity of corporate transactions which involve the transfer on corporate books of earnings, earned surplus, etc., from one account to another. Earnings, under modern corporate practice, no longer retain the simplicity of meaning of the earnings considered by this Court in Earp's Appeal, supra, and other decisions." Other reasons, such as the prevalence of common stocks in trust portfolios, the unprecedented boom during the last decade which resulted in the issuance of "more stock dividends and offerings than our economy has ever experienced before", etc., have added to the practical difficulty of applying the Rule.

In his adjudication, the able auditing judge well stated: "The apportionment picture in Pennsylvania has, indeed, degenerated into a sorry state, in spite of the lofty ideals of the many sincere and scholarly ju-

rists who contributed to its development over the years. The fantastic growth of business structures in this country in the past one hundred years, with its myriads of corporate complexities and resulting astronomical apportionment calculations, has made the Pennsylvania Apportionment Rule practically unworkable today. It is described as an equitable doctrine, but it frequently produces results which are not only completely unforeseen and unpredictable, but actually harsh, inequitable and often contrary to the intentions of the creator of the trust. . . . Because of recent amendments to our laws permitting fiduciaries to invest in common stocks, most estates, even the smaller ones, now have shares of the nation's largest corporations in their portfolios. The apportionment problems which confront trustees today, as the result of such holdings, create administrative problems of such complexity as to make the management of trust estates a truly nightmarish experience. It is utterly unrealistic to expect trustees to be compelled to analyze the intricate financial statements of mammoth multi-million dollar corporations, every time a stock dividend is declared, or a share of stock sold. The entire subject of apportionment should be carefully reviewed and the rule simplified by the Courts which created the existing burdensome situation."

Pennsylvania, of all the states which adopted the Uniform Principal and Income Act, stands alone in having held that retroactive application of the Act is unconstitutional. In the original Restatement of Trusts, Section 236(6) promulgated in 1935, the American Law Institute adopted the Pennsylvania Rule: in the 1948 Supplement to the Restatement of Trusts the Pennsylvania Rule has been abandoned in favor of the Uniform Principal and Income Act.

Over a century ago the Pennsylvania Rule of Apportionment was created: great and distinguished ju-

rists contributed to its creation and the formulation of its principles. The purpose and aim of the Rule was commendable: it sought, and was generally acknowledged to have achieved, an equitable adjustment of the rights of both life tenants and remainderman. Over sixteen years ago, faced with drastic changes in our economy and other factors which rendered unworkable the Rule, the legislature in its wisdom abolished the Rule and substituted a new Rule in its place. Our only task is to determine whether the legislative enactment can constitutionally apply to trusts created prior to its passage. *Crawford* found it could not and *Pew* and *Warden* followed *Crawford*. We have re-examined these decisions and disagree with the results reached. The legislative enactment did not modify or extinguish any vested property rights. There is no vested property rights in a court-made rule of apportionment. The experience under the *Crawford* rule teaches us it cannot justly be applied and, therefore, we overrule *Crawford* followed in *Pew* and *Warden*.

In overruling these decisions, we are keenly aware of the fact that distributions have been made in many estates in reliance on these decisions and the vitality of the Pennsylvania Rule of Apportionment. *Such distributions are not affected in any manner by our present ruling.*

In the case at bar, the court below, in reliance on *Crawford, Pew* and *Warden,* applied the Pennsylvania Rule of Apportionment to the solution of the three problems presented to it.

As to the second question of apportionment we believe the decree of the court below was in error. While we have never held that ordinary small stock dividends should be considered as income payable to the life tenant, we have not held to the contrary; our prior decisions dealt with stock dividends, extraordinary in nature. If a total stock distribution for the current year

is payable at the rate of 6% or less of the corporation's outstanding shares before such distributions were made such distribution in stock of the distributing corporation should be treated as income.

As to the first and third questions of apportionment, the decree of the court below was correct.

In holding valid the retroactive provisions of the Principal and Income Act and, in effect, abolishing the Pennsylvania Rule of Apportionment, we do so prospectively: *Great Northern Ry. Co. v. Sunburst*, 287 U. S. 358. *In all audits now pending and henceforth,* distributions shall be made under the provisions of the Principal and Income Act of 1947.*

Decree, as modified, affirmed. Each party pay own costs.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

I enthusiastically agree with that part of the majority Opinion which holds that small stock dividends which do not exceed 6% in that particular year belong to the life tenant and are not subject to apportionment. However, I would not restrict stock dividends to that of the issuing corporation or require them to be of the same class. I said in *Cunningham Estate*, 395 Pa. 1, 149 A. 2d 72 (page 34) and I repeat: " '[a] Ordinary cash or scrip [or stock] dividends coming to [the trustee] belong to life tenants regardless of how soon after testator's death they are declared by the company whose stock is held in the corpus. . . .'

"In order to avoid costly, vexation, 'de minimis' litigation, and to eliminate conflict and confusion, and

———

* This statement applies to all receipts, including stock distributions of six (6%) per cent or less.

to comply with the requests of Bench and Bar to make clear and definite the rules with respect to various situations that frequently arise, I would add: An ordinary cash dividend and an ordinary stock dividend belong to the life tenant, irrespective of when earned and irrespective of whether the intact value is or is not thereby impaired. Ordinary cash dividends include small extra cash dividends which are paid currently or irregularly (usually at year's end). Ordinary stock dividends would include stock dividends [of any class] which are paid quarterly, semi-annually or annually, currently or irregularly, and do not exceed 6% in any one year."

Not once in over 100 years has this Court ever heretofore declared or required a small stock dividend—irrespective of what kind or class is issued—to be apportioned. The reasons are obvious and cogent. In the first place the primary object of testator's bounty is his widow or occasionally his children, in preference to his often unknown or unseen or unborn issue. To require that small stock dividends of another class or another corporation belong to principal vitiates testator's dominant intent. To hold that these and all small stock dividends should be apportioned between the life tenant and the remainderman (as appellee urges) is ridiculous. They have a market value (sometimes) of $2 or $5 or $19 a share. Such an apportionment rule would multiply litigation; it would be so costly, vexatious and wasteful that it would deplete large estates and virtually ruin small estates; and to express it mildly, it would be obviously impractical, unrealistic and unwise!

The majority opinion declares that an extraordinary stock dividend of 50% is not an apportionable event and therefore the dividend belongs to principal, even though 62% of the dividend represented earnings which had accumulated since the acquisition of the

stock by the trustee. In this conclusion the majority is supported by their majority opinion in the very recent case of *Cunningham Estate,* 395 Pa. 1, 149 A. 2d 72 (1959). However, they have now repudiated and impliedly overruled *Cunningham Estate.* I pointed out in great detail in my concurring and dissenting opinion in *Cunningham Estate* (pages 15 to 62) that where, as here, an extraordinary stock dividend is paid out of accumulated applicable earnings which were earned and accumulated since the acquisition of the stock (in the instant case 62% of the stock dividend was legally authorized and issued by virtue of a transfer *from earned surplus* to the capital stock account and only 38% of the capital surplus was applied to support the stock dividend), that part which represents accumulated and paid out earnings (viz., 62% of the dividend) belongs to the life tenant. I cited therein a myriad of cases which supported this proposition. I am convinced that this was and should be the law and since *Cunningham Estate* has been overruled, I would award 62% of the stock dividend to the life tenant.

The majority further affirms that the life tenant is not entitled to any portion of the proceeds of sale of the stock of the American Gas Company which was sold at a market value loss, even though part of the proceeds included in the sale price were due to and represented accumulated capitalized applicable earnings.\*

---

\* Although it is a waste of time, I desire to keep the record clear and straight. When stock is sold, as here, at a loss in its carried (market) value, the life tenant is entitled to the earnings which he can prove have accumulated since acquisition and are applicable and includable in the sale price, i.e., the difference between the book value (called intact value) *at date of acquisition* ($11.76 per share), *and at date of sale.* In determining earnings it is ridiculous to compare book value on the one hand with market value on the other hand. With one exception, i.e., *Arrott Estate,*

The majority reach their conclusion in re the 50% stock dividend and the proceeds of sale, by expressly overruling *Crawford Estate*, 362 Pa. 458, 67 A. 2d 124; *Pew Estate*, 362 Pa. 468, 67 A. 2d 129; and *Warden Trust*, 382 Pa. 311, 115 A. 2d 159; and impliedly and necessarily their most recent opinion in *Cunningham Estate*, 395 Pa., supra (1959). The rationale of the majority decision—"convenience"—is something I cannot appreciate or approve. The majority not only repudiate the 100 year old Pennsylvania rule of appor-

---

383 Pa. 228, 118 A. 2d 187, which everyone agrees was a hasty error and should be overruled, all authorities for countless years have agreed that *market value is not* the correct test for or the equivalent of intact value. The fact that the stock was sold at a loss in its market value does not and should not affect the equitable rule of apportionment which, as above stated, has no connection with market value; nor should it deprive the life tenant of the accumulated earnings to which, all cases agree, he is entitled. For example, in a salvage operation where a mortgage is foreclosed and the real estate is bought in by the trustee and the land is subsequently sold at a loss, the life tenant is entitled out of the proceeds of the sale to the income which has been received or accrued. It is ridiculous to attempt to deduct an orange from an apple or a banana, you deduct an orange from two oranges, etc., but if you attempt to deduct an orange from a banana all you get is a squash. The true rule in determining whether and what a life tenant is entitled to out of the proceeds of sale is that he is entitled to what he can prove are the earnings which had accumulated since the acquisition of the stock and are applicable and includable in the sale price, namely, the difference between the book value (called intact value) at date of acquisition and the (adjusted) book value at date of sale. See Cunningham Estate, at page 40. Unfortunately, the latter is not disclosed in the instant case.

The parties agreed to the following stipulation: "If gain is determined to be the difference between intact value and proceeds of sale, $2,322.80 will be apportioned to income; [but if] the carrying (market) value is used no part of the proceeds go to income." Since its meaning is neither clear nor sufficient with respect to the question in issue, I believe the case should be remanded for further proof on this point.

tionment which was unanimously reaffirmed approximately one year ago, but they further declare that what this Court repeatedly said was unconstitutional, was constitutional and vice versa. The Pennsylvania rule of apportionment which often is difficult to work out or apply practically, has always been an equitable rule intended to favor the life tenant (widow or children) who are almost always the primary objects of the testator's bounty. The rule says, in substance, that when an *extraordinary* stock dividend is paid or a *sale* is made which represents, in part, earnings which had accumulated from the time the stock was acquired—the earnings, no matter in what form they are given by a corporation or are hidden in a sale, belong to the life tenant. Every year, since *Crawford Estate* was decided in 362 Pa. (1949) the Supreme Court has been asked to overrule it, and every year the Supreme Court has rejected all such pleas, arguments and contentions. It rejected it in *Steele Estate,* 377 Pa. 250, 103 A. 2d 409; it rejected it in *Warden Trust,* 382 Pa. 311, 115 A. 2d 159; it rejected it in *Jones Estate,* 377 Pa. 473, 105 A. 2d 353; and within the last two years it again rejected it in *Cunningham Estate,* 395 Pa., supra. Each of these cases, as well as many others which were cited or quoted in my *Cunningham* Opinion, reaffirmed the equitable rule of apportionment which, I repeat, has been the law of Pennsylvania for over 100 years. Every member of the present Court (except the recently elected Justice EAGEN) who is now voting to repudiate *Cunningham Estate,* voted in that recent case in favor of the Pennsylvania rule of apportionment and rejected all pleas to change the rule and overrule the prior decisions of this Court. Justice BENJAMIN R. JONES, speaking for the majority, and on this point for the entire Court, decreed that *there should be an apportionment* between principal and income in the following four situations:

"... '(1) the distribution by the corporation of an *extraordinary*\* cash or *stock dividend,* or (2) the liquidation of the corporation, or (3) a *sale* of the stock by the trustees, or (4) the issuance of stock rights [citing cases]': Jones Estate, 377 Pa. 473, 476, 105 A. 2d 353, 354."

Since *Crawford Estate* in 1949, and certainly in the last two years since *Cunningham Estate* in 1959, there has been no change of circumstances; not even a change of personnel in the Court; nothing, absolutely nothing, has occurred except a change of mind. Once again I plaintively ask: Stare Decisis—"Quo Vadis?"\*\*

Mr. Justice MUSMANNO joins in this concurring and dissenting opinion.

---

\* Italics throughout, ours.

\*\* A brief history of what has happened to Stare Decisis in Pennsylvania in the last few years will be found in my concurring opinion in *Michael v. Hahnemann Medical College and Hospital of Philadelphia,* 404 Pa. 424, 428, 172 A. 2d 769.